[Civ. No. 20102.   Second Dist., Div. Three.   May 26, 1954.]

CHARLES W. FOTH et al., Respondents, v. CITY OF LONG BEACH et al., Appellants.

Irving M. Smith, City Attorney, and Atlee S. Arnold, Deputy City Attorney, for Appellants.

John Sanford Todd, Ted Sullivan and Angelo M. Iacoboni for Respondents.

VALLÉE, J.—Appeal by defendants from a judgment which decreed that plaintiffs are entitled to a peremptory writ of mandate commanding defendants to terminate the proceedings for the annexation to the city of Long Beach of territory described as "Increment 110" and a special election set therefor on August 20, 1953. The judgment also decreed

that the attempted proceedings for the annexation of the territory and every purported resolution and ordinance pertaining thereto are void and of no effect. Defendants demurred to the petition and filed a return to the order to show cause and answer to the petition. The demurrer was overruled and a trial had on the issues.

Plaintiffs are owners of real property in "Increment 110." They commenced and are prosecuting this proceeding on their own behalf and as representatives of the other owners of property in the territory who made protests in writing against the annexation. The territory is unincorporated, is inhabited, is contiguous to Long Beach, contains about 503 acres, and has 2,333 separate parcels therein.

On April 18, 1953, pursuant to the "Annexation Act of 1913" (Gov. Code, §§ 35100-35158), the proponents of the annexation published a notice of intention to circulate a petition therefor. On June 23, 1953, after the receipt and checking of the petition which had been circulated, the city council of Long Beach adopted a resolution in which it gave notice of its intention to call an election to be held August 20, 1953, in "Increment 110" on the question of annexation, and fixed July 14, 1953, at 11 a. m., in the council chamber as the time and place where any person owning real property within the territory might appear and show cause why the territory should not be annexed. The resolution was duly published.

On July 14, 1953, and prior to 11 a. m., there was filed with the council a document protesting the annexation and the holding of the special election, signed by persons claiming to be the owners of 1,228 separate parcels of property in the territory proposed to be annexed. A majority of the separate parcels within the territory is 1,167. The council, without holding a hearing, adjourned the matter until July 21, 1953, at 11 a. m., and referred the protests to the city engineer and the city manager for checking and verification.

At the adjourned hearing, on July 21, 1953, at 11 a. m., the city engineer made a report based on a check made of the records of Title Insurance and Trust Company as to the ownership of the parcels included in the protests. He reported that of the persons claiming to be the owners of the 1,228 parcels protesting, the records of the title company disclosed that 99 of such persons had no record interest in the parcels they respectively claimed to represent, and that written protest had not been filed by the owners of a majority of the

separate parcels. He also reported that of the claimed owners of the 1,228 parcels protesting, 367 had signed the protests between April 18 and June 23, 1953, the latter date being the date the council adopted the resolution giving notice of its intention to call the election, and that the protests were insufficient.

After the report had been made counsel for the protestants told the council "that a majority protest had been filed; that as respects the 99 disallowed protests, all of the signers thereof had an ownership interest in the separate parcels of real property represented by their signatures on the written protests; that some of said persons owned said realty by way of unrecorded deeds; some by recorded and unrecorded contracts of sale; some by survival of a deceased joint-tenant; that a person may be the owner of real property even though his interest is not of record." He then asked the council for time in which to examine the protests and the records compiled by the city engineer in order to ascertain the identity of the 99 disallowed protests. This was about 11:13 a. m. The council granted the request and first adjourned the hearing for 20 minutes and then until 1:45 p. m., the same day. Between 11:13 and 1:45 four or five of the protestants and their attorneys went through the 1,228 protests and compiled a list of and other information concerning the 99 disallowed protests. At no time prior to the recess at 11:13 did the protestants or any of them or their counsel know the identity of the signers of the disallowed protests or the identity of the parcels of property they signed a protest for, nor did any of them have any prior knowledge that said protests were going to be disallowed.

At 1:45 p. m., the same day, the hearing was resumed and counsel for the protestants addressed the council stating that he, his associate, and several of the protestants had compiled a list of the 99 disallowed protests; that a person could sign a valid written protest against annexation even though the person's ownership interest in land did not appear of record; that all of the persons signing the 99 disallowed protests had an ownership interest in the property they purported to represent; that if the council would continue the hearing if only for 24 hours, he would introduce evidence that all of said persons had an ownership interest in the property they purported to represent on the written protests. He was advised by the council that the second and final reading of the ordinance calling the annexation election and setting up the

machinery therefor would have to take place on the following day or the election could not be held on the date previously set; that, therefore, said ordinance would have to be given its first reading that day; that if he had any evidence to present showing that the signers of the 99 disallowed protests were the owners of the real property he should present it then. At that time the city attorney advised the council that any signatures affixed prior to June 23, 1953, were invalid; that the owner of an unrecorded interest could not protest; and that if the hearing were continued the election could not be held on the date set. The council then denied the protestants a continuance, and immediately thereafter adopted a motion that the hearing be concluded and that it be found that written protests were not signed by the owners of a majority of the separate parcels of property in the territory proposed to be annexed.

The first reading of an ordinance calling the annexation election and setting up the machinery for holding it was had immediately. The next day, July 22, 1953, at 12:01 a. m. (one minute after midnight), the council met and the second and final reading of the ordinance was had. They met at that time because a number of the councilmen "were going on a fishing trip. . . . They had previously planned to leave at 11:30 a. m. on July 21st."

The court in part found: 1. The action of the council in refusing to recognize the majority protests was capricious, arbitrary, in excess of its powers and jurisdiction, and in violation and derogation of the rights of all of the protestants. 2. Neither the council, the city, nor any official of the city has any authority to conduct an election on August 20, 1953, or at any other time, for the purpose of effectuating an annexation of "Increment 110" pursuant to the proceedings described.

The court concluded: 1. The council acted in excess of its jurisdiction in overruling the protests and proceeding with the election. 2. Written protests against annexation filed with the council prior to the hour set for hearing protests are presumed to be valid. 3. The 367 protests dated between April 18 and June 23, 1953, both inclusive, were sufficient, valid in form, and met the requirement of law. The council did not have any evidence before it to justify it in refusing to allow the 367 protests, and acted arbitrarily, capriciously, and in excess of its jurisdiction in disallowing said protests. 4. An owner of an equity in real property may make a valid

written protest against the annexation of his real property to a municipality pursuant to section 35120 of the Government Code, whether or not his ownership interest appears of record. 5. If a city council finds that some of the signers of written protests against annexation are not the owners of the separate parcels of real property they purport to represent on said protests, said protestants, on request, must be given a reasonable opportunity to present to said city council further evidence of their ownership interest in said real property. 6. If the council were legally permitted to conclude the protest hearing on the same date they announced for the first time the number of disallowed protests and the reasons therefor, this would, in effect, require all of the protestants (1,228 in this case) to appear before the council with evidence of their ownership of the real property because none of them would have any advance knowledge as to whose protests would be disallowed or the reasons therefor; to require all of said protestants to appear before the council would be unreasonable. 7. The council acted arbitrarily, capriciously, and in excess of its jurisdiction when it continued the protest hearing from July 14, 1953, to July 21, 1953, the latter date being the last day on which the first reading of an ordinance calling the election could have been had if the election was to have been held on the date previously set, where the result was that on said last mentioned day the council for the first time announced the number of disallowed protests and the reasons therefor and the signers of said protests were given no opportunity to appear before the council and meet the challenge of their protests. 8. Since the 99 protestants had no knowledge prior to July 21, 1953, that their protests were going to be disallowed, it would be unreasonable to require them to attend the hearing on that day armed with documents evidencing their ownership interest in the real property. 9. The continuance granted to the protestants from 11:13 a. m. to 1:45 p. m. on the same day for the purpose of compiling a list of the 99 disallowed protests was an unreasonably short time within which to compile said list, notify the signers of the disallowed protests, and arrange for their appearance before the council on that afternoon with their documentary evidence of ownership of the real property they purported to represent on the written protests. 10. The council abused its discretion when it refused to permit the signers of the 99 protests, all disallowed by the council on the basis that the signers were not the

owners of the real property they purported to represent, a reasonable opportunity to appear and present further evidence of their ownership interest in the property which they purported to represent on their written protests where said protestants had no previous knowledge that their protests were going to be disallowed by said city council and where a request for a continuance for that purpose was made, and such action was arbitrary, unreasonable, capricious, and in excess of its jurisdiction.

Judgment was entered on August 25, 1953, that plaintiffs are entitled to mandate commanding defendants to terminate the annexation proceedings and the election, commanding the city clerk to refrain from carrying out any direction of the council with respect to the election, and adjudging the attempted annexation proceedings and each purported resolution and ordinance pertaining thereto void and of no effect. The election was held prior to the entry of judgment.

Section 35121 of the Government Code[1] provides that if the city legislative body finds that protest is made by the owners of a majority of separate parcels of property within the territory, no further proceedings for the annexation shall be taken for one year after the finding. If the 367 protests signed between April 18 and June 23, 1953, were invalid, the owners of less than a majority of the separate parcels of property within the territory filed protests. Also, if the protests of the 99 protestants whose ownership did not appear on the records of Title Insurance and Trust Company were invalid, the owners of less than a majority filed protests.

Defendants first contend the court erred in holding as valid protests the 367 that were signed between April 18 and June 23, 1953. The argument is that protests are premature and invalid if signed prior to receipt by the council of a sufficient petition requesting annexation and before the council has adopted a resolution setting the date for hearing protests and fixing a date for an annexation election. The contention is untenable.

Section 35106 provides: "The consent of the city legislative body shall be obtained before any proceedings are commenced pursuant to this article." Section 35108 provides: "In cities having a planning commission, consent shall not be given by the legislative body until it has received a report or recommendations from the commission." Long Beach has a plan-

---

[1]All section references are to the Government Code unless otherwise noted.

ning commission. (Stats. 1921, ch. 32, p. 2123.) Section 35111 provides: ''Before circulating a petition relating to . . . annexation of territory to, a city, the proponents shall publish a notice of intention to do so pursuant to the Elections Code. The notice shall contain the names of the proponents intending to circulate the petition and the specific boundaries of the territory proposed to be annexed, and may be accompanied by a printed statement not exceeding five hundred words in length, containing reasons for the petition.'' Section 35112 provides: ''Within ten days after publication the proponents shall file a copy of the notice and accompanying statement, if any, and an affidavit of the publishing or posting, with the city clerk.'' Section 35113 provides: ''Within fifteen days after such filing, the legislative body may adopt a resolution acknowledging receipt of the notice and approving the circulation of the petition. A petition asking for the annexation of any portion of the territory described in the notice, shall not be filed with any other city for 50 days after the adoption of such a resolution.'' Section 35114 provides: ''Twenty-one days after the publication or posting of the notice and statement, the petition may be circulated among the voters within the area proposed to be annexed pursuant to the Elections Code.'' Section 35116 reads: ''Upon receiving a petition signed by not less than one-fourth of the qualified electors residing within the territory, as shown by the county registration of voters, containing a description of the new territory proposed to be annexed and asking that the territory be annexed, the city legislative body shall without delay pass a resolution of intention to call a special election giving at least fifty days notice thereof and of its intention to submit the question of annexation to the electors residing in the territory.''[2] Section 35117 provides that the resolution shall contain a notice of the day, hour, and place any person owning real property within the territory may appear before the legislative body and show cause why it should not be annexed. A hearing must be held not less than 15 nor more than 40 days after the passage of the resolution. (§ 35118.) A copy of the resolution must be published at least once a week for the two weeks prior to the hearing. (§ 35119.) Section 35120 reads: ''At any time not later than the hour

---

[2] In 1953 the following sentence was added to section 35116: ''The city clerk and the county officer having charge of the registration of voters shall within two weeks check the petition and certify the sufficiency thereof.'' (Stats. 1953, ch. 1125, § 1.)

set for hearing objections to the election, any owner of property within the territory may make a written protest against the election. The protest shall state in general terms the name of the owner of the property affected and the location and area of the property.'' At the time set for hearing protests the city legislative body shall hear and pass on all protests so made. (§ 35121.)

An annexation proceeding is commenced when the consent of the city legislative body is obtained. (§ 35106.) The property owners within the territory are first notified that it is proposed to annex their property by the publication of the notice of intention required by section 35111. Such notice of intention was published on April 18, 1953. On June 23, 1953, the council adopted the resolution calling the election. The protests were that it was in the interests and desires of the signers that the territory ''NOT BE ANNEXED to Long Beach and that the special annexation election contemplated by the Annexation Act of 1913 Not Be Called or Held.'' ■ We think the purpose of publication of the notice of intention is to notify property owners of the pending annexation and the boundaries thereof and to give them an opportunity to protest should they desire. ■ Protests may be made ''At any time not later than the hour set for hearing objections.'' (§ 35120.) This means just what it says: ''at any time not later'' than the closing hour. It does not mean after the closing hour for protests has been fixed as argued by defendants. Section 35120 may be contrasted with section 9756 of the Elections Code which provides that ''Not earlier than the sixtieth day nor later than 12 o'clock noon on the fortieth day before a municipal election'' the voters may nominate candidates for election. Undoubtedly if the Legislature had intended that a protest could not be signed earlier than the date the council adopts a resolution setting the date for hearing protests and fixing a date for the election, it would have said ''not earlier'' than that date.

■ We are not impressed by the argument that a protest is against the election and that, therefore, a protest may not be signed until the election is set. The election is only one step in effecting an annexation. What a protestant does is to protest against the territory in which he owns property being annexed to a municipality. The question submitted to the voters is whether the territory ''shall be annexed to and incorporated within the city.'' (§ 35122.) Speaking of a protest under the Street Improvement Act of 1889 (Stats. 1889, p. 158, § 3),

the court in *Los Angeles L. Co.* v. *Los Angeles*, 106 Cal. 156, said (p. 161 [39 P. 535]): "It is sufficient if they indicate to the city council that the proposed improvement is objected to, and that this objection is made by the owners of a majority of the frontage upon the line of the work."

We hold therefore that the 367 protests signed between April 18 and June 23, 1953, both inclusive, were valid.

■ Defendants urge that the court erred in concluding that the protestants were not given a fair hearing on the protests by the council. The point cannot be sustained. The court found on uncontroverted evidence that none of the protestants knew, prior to 11 a. m. on July 21, 1953, that the protests were questioned; that they did not know, prior to 11:13 a. m. of that day, the identity of the signers of the 99 protests or the identity of the separate parcels of property the 99 signed a protest for, nor did any of them have any prior knowledge that the 99 protests were going to be disallowed on the ground their ownership did not appear of record. Notwithstanding these facts which were made known to the council, the council only gave the protestants about two and a half hours within which to ascertain the facts, get the 99 before the council, and present evidence of their ownership. ■ A person may own property within the territory without the fact of ownership being of record. And such a person has a right to protest. (Gov. Code, § 35120.) The city attorney erroneously advised the council that a nonrecord owner could not protest. As the trial judge said, it would be absurd to hold that 1,228 protestants are required to be present in the council chamber on the date set for hearing protests. The protests were valid on their face; and until they were questioned, the protestants had no means of knowing whether any of them would be questioned, and if questioned, the ground thereof.

Speaking of the hearing on protests required by section 35121, the court in *Morin* v. *City Council*, 109 Cal.App.2d 268, said (p. 273 [240 P.2d 688]): "Such a hearing contemplates a fair and impartial hearing at which competent evidence may be presented. (*Saks & Co.* v. *City of Beverly Hills*, 107 Cal.App.2d 260 [237 P.2d 32], *Carstens* v. *Pillsbury*, 172 Cal. 572 [158 P. 218], 29 C.J. 285.)"

We are of the opinion that the action of the council was in flagrant disregard of the rights of the protestants. Some members of the council appear to have had more interest in getting away on a fishing trip than in giving the protestants

a fair hearing. We agree with the trial judge that the action of the council was arbitrary, unreasonable, capricious, and in excess of its jurisdiction. Its action was in effect a denial of a hearing to the protestants.

As noted, the court adjudged that the proceedings are void. Defendants contend the court should have remanded the matter to the council for further proceedings to determine whether any of the 99 protestants were owners of property within the territory. The same contention was made below. The implication is that we should reverse the judgment with directions to remand the matter to the council. We agree with the opinion of the trial judge. In concluding the trial on August 7, 1953, he said: ''The proceedings therefore are void. It is too late for me to remand this back to the City Council to take evidence on this ownership. I have thought of that this morning, but there is no way I can send it back to the City Council now to take evidence of the ownership and still have the election on the date it is advertised, that is, on the 27th [sic], I believe. It would seem to me that the court, having found that there was an abuse of this discretion which invalidated the proceedings, and the time having expired for anything else, all the court can do is issue the return as prayed.'' The judge restated the date as the ''20th.''

To have remanded the matter to the council would have been a fruitless proceeding. The election had been held and the vote canvassed at the time judgment was entered. The council made it impossible to remand the matter for any purpose. After having set the election for August 20 it continued the hearing of protests to the last day on which first reading of the ordinance calling the election could be had. Without giving the protestants a hearing it found the protests insufficient. It read the ordinance notwithstanding the objection of counsel for the protestants, and the next day read it the second and final time. It is no longer possible for the council to hold a hearing. Section 35102 provides that if an election for annexation is not called or held in the manner specified in the Government Code all proceedings relating to the annexation are void. Since the council could not have done other than terminate the proceedings, it would have been futile to have ordered a remand. (See *American Distilling Co.* v. *City Council, Sausalito,* 34 Cal.2d 660 [213 P.2d 704, 18 A.L.R.2d 1247].) In *Morin* v. *City Council,* 109 Cal. App.2d 268, it was said (p. 273 [240 P.2d 688]) : ''Defendants urge that if the council incorrectly held these protests in-

sufficient the court should have remanded the matter to the council for a further hearing in accordance with the court's views. There would be no reason to remand it to the council for a further hearing. The trial court's finding of sufficiency required the conclusion that the city council had no discretion to do other than comply with the statute and terminate the proceedings."

Decisions relied on by defendants do not, in our view, support them.[3] Circumstances present in those cases are absent here. In *La Prade* v. *Department of Water & Power,* 27 Cal.2d 47, the court said (p. 53 [162 P.2d 13]) : "If a hearing has been denied or the evidence is insufficient to sustain the action of the board, *and it is still possible for the board to hold a hearing or exercise its discretion,* then the matter should be remanded to the board for further consideration rather than having a trial de novo in the superior court and requiring that court to exercise independent judgment on the facts which should be determined by the board." (Italics added.) In the present case it is not possible for the council to hold a hearing or exercise any discretion. It exhausted its jurisdiction.

Affirmed.

Shinn, P. J. and Wood (Parker), J., concurred.

[3]*Universal Consol. Oil Co.* v. *Byram,* 25 Cal.2d 353 [153 P.2d 746]; *La Prade* v. *Department of Water & Power,* 27 Cal.2d 47 [162 P.2d 13]; *Steen* v. *City of Los Angeles,* 31 Cal.2d 542 [190 P.2d 937]; *English* v. *City of Long Beach,* 35 Cal.2d 155 [217 P.2d 22, 18 A.L.R.2d 547]; *Fascination, Inc.* v. *Hoover,* 39 Cal.2d 260 [246 P.2d 656]; *Thompson* v. *City of Long Beach,* 41 Cal.2d 235 [259 P.2d 649]; and *Ware* v. *Retirement Board,* 65 Cal.App.2d 781 [151 P.2d 549].