[Civ. Nos. 16116, 16117.   First Dist,. Div. One.   Apr. 21, 1955.]

RALPH W. JOHNSON et al., Respondents, v. CITY OF SAN PABLO et al., Appellants.

[Civ. Nos. 16118, 16119.   First Dist., Div. One.   Apr. 21, 1955.]

CITY OF SAN PABLO, Appellant, v. CITY OF RICHMOND et al., Respondents.

Robert T. Anderson, Richard C. Johnston, James P. O'Drain and R. W. Pelletreau for Appellants.

Tinning & DeLap and Dana Murdock for Respondents in Civ. Nos. 16116, 16117.

Thomas M. Carlson, City Attorney, and Frederick Bold, Jr., Special Assistant to City Attorney, for Respondents in Civ. Nos. 16118, 16119.

WOOD (Fred B.), J.—Proceedings for the annexation of overlapping territory to the cities of San Pablo and Richmond, respectively, were in progress when proceedings in mandamus and in certiorari were instituted against each city. There resulted four separate judgments, each holding the Richmond annexation proceeding valid and the San Pablo annexation proceeding invalid. San Pablo has appealed.

If valid, the San Pablo proceeding, as the first in time, gave San Pablo jurisdiction to the exclusion of Richmond. Accordingly, we will consider first the validity of the San Pablo proceeding.

### THE SAN PABLO ANNEXATION PROCEEDING

The San Pablo annexation proceeding was conducted under the Annexation Act of 1913 (Gov. Code §§ 35100-35158 and §§ 35000-35003). It had progressed to and including the

adoption by the city council of a resolution approving the circulation of a petition for annexation (see § 35113) when temporarily restrained upon the issuance of the alternative writ of mandate and the writ of review in cases Nos. 16116 and 16117.

The trial court concluded that the San Pablo proceeding was invalid and of no effect. That conclusion rested upon findings that substantial, separable and distinguishable uninhabited areas were included in the territory proposed for annexation and that certain steps taken in the proceeding were jurisdictionally defective for failure to observe the applicable statutory requirements. We will consider first the question concerning the inclusion of uninhabited territory.

## AREAS PROPOSED FOR ANNEXATION

The court found that the territory proposed for annexation "consists of approximately 6.2 square miles, substantial and clearly separable and distinguishable portions of which are uninhabited territory as 'uninhabited territory' is defined in the Uninhabited Territory Act of 1939, two separable portions of said territory are inhabited residential subdivisions, portions of said territory are clearly separable the predominant uses of which are industrial, agricultural, marsh and tide lands and submerged lands.'' The court specifically described as "uninhabited" the area proposed for annexation to Richmond, and the greater portion of that area was included in the territory proposed for annexation to San Pablo.

The evidence appears to support the finding, at least as to the submerged lands and the area which was also proposed for annexation to Richmond.

William Edward Finley. acting planning director of the city of Richmond, testified that there are about 4,215 acres in the San Pablo annexation territory[1] of which some 2,870 acres are totally covered by water at all times.

The witness, both on the witness stand and in the report of the planning commission to the Richmond city council, divided this territory into four areas designated A, B, C, and D. In analyzing the territory he found it necessary to determine some natural boundaries because they were so different in nature and character. He had to do this to differentiate. They are indicated upon the accompanying diagram, except that the western boundaries of areas B and C are not shown on the diagram. Those areas extend westerly into San Pablo Bay, a distance of about 2.8 miles beyond the portions thereof shown on the diagram.

Area A extends northerly from the north boundary of Richmond to Wild Cat Creek, and westerly from the Southern Pacific tracks to the Richmond city limits. It contains 199 acres, is primarily residential, has 862 residential dwelling units and a population of about 3,500.

Area B, extending northerly from Wild Cat Creek to San Pablo Creek, and westerly from the Southern Pacific tracks to the Richmond boundary and into San Pablo Bay to the Marin-Contra Costa line, containing 1,445 acres, of which 1,000 are under water. It is zoned for heavy industry, at present used predominantly for agricultural purposes, with

[1]Approximately three times the presently incorporated area of San Pablo.

scattered industries and a few homes. It has 33 scattered residences and a population of 115.

Area C extends northerly from San Pablo Creek to the westerly extension of the north line of Parchester Village (excluding Parchester Village) and from the Southern Pacific tracks westerly to the Marin-Contra Costa boundary. It is predominantly industrial and agricultural, has a population of 80, 23 residences, and contains 2,209 acres, including 339 of uplands, the remainder being under water. He excluded Parchester Village from his recommendation for annexation to Richmond because it was concentrated in population and was not asking for annexation to Richmond as were the people in North Richmond.

Area D extends northerly from the Richmond city limits between the Southern Pacific and Sante Fe tracks to a line south of Parchester Village. At its northerly end Area D extends across the Sante Fe tracks to include a portion of the Tank Farm property immediately east of the Santa Fe tracks. It contains 232 acres, 50 per cent developed for industry and 50 per cent vacant; three residences with two registered voters. It is zoned for heavy industry, is choice industrial land because served by two main line railroads and should be reserved for such purposes. The portion of D which is east of the Santa Fe tracks was not included in the proposal for annexation to San Pablo. Richmond planning commission's attitude was that if annexation were had under the Uninhabited Act this portion ought to be included in the annexation to Richmond. The territory seeking annexation to Richmond is identifiable by boundaries of physical characteristics.

Parchester Village is a single family residence area which is fully developed.

The land in areas B and C has scattered homes throughout; i.e., farmhouses, dwellings of a substandard character, yet people live there.

In determining whether this evidence supports the findings in question, we are governed by the basic principle that a separate and independent uninhabited area may not be included in a body of land proposed for annexation to a city under the 1913 act.

The test whether a given area is uninhabited is furnished by section 35303: ". . . territory shall be deemed uninhabited if less than twelve registered voters reside within it . . ."

■ What is an independent and separate area presents a more difficult question. It is a question of fact and no precise formula has been evolved, perhaps none can be evolved, to serve as a ready test. It is of course the function of the trier of the facts to decide such a question in the first instance. A reviewing court's function is that of ascertaining whether the finding made in a particular case is supported by the evidence in the case.

In *People* v. *Town of Ontario*, 148 Cal. 625 [84 P. 205], portions of territory annexed to a city under the 1889 act were uninhabited. The trial court held that those portions were properly included. The Supreme Court affirmed upon the ground that the evidence sustained the conclusion of the trial court that the territory "taken as a whole, may fairly be said to be inhabited" notwithstanding "the presence of several uninhabited tracts or parcels, each exceeding five acres in area." (P. 641.)

In *Rogers* v. *Board of Directors of Pasadena*, 218 Cal. 221 [22 P. 509], an original proceeding in the Supreme Court, a contention that certain territory being annexed under the 1913 act contained large separable parcels of uninhabited lands was overruled, the court saying: "An examination of the map which is included in the record fails to support the assertion that the unoccupied portions of the territory are separable and independent of the main inhabited portions. There are streets and roads in the whole tract, and the inhabitants are scattered throughout its area. While this court doubtless has power in a clear case to determine that a case falls outside the scope of the act of 1913 [citations], this is not such a case." (P. 223.)

In *People* v. *City of Whittier*, 133 Cal.App. 316 [24 P.2d 219], one uninhabited parcel was about the size of a city lot and served as the site of the city's pumping plant. The other was a very small piece of ground consisting entirely of a railroad right of way. Each of the other parcels was inhabited. The legal description showed "the property to be one single body of land lying southwesterly of the old city lines and contiguous thereto." (P. 320.) These facts did not support the trial court's conclusion that separate and independent uninhabited areas were included. Applying the rule enunciated in *People* v. *Town of Ontario, supra,* 148 Cal. 625, the appellate court held that "the whole proposed 'addition' to the City of Whittier is in fact and in law one single inhabited body of land." (P. 321 of 133 Cal.App.)

In *Capuchino Land Co.* v. *Board of Trustees*, 34 Cal.App. 239, 243 [167 P. 178], the court observed that the uninhabited area held to be separate and independent was "a compact rectangular body of land embracing 1,890 acres, which has apparently never been subdivided or intersected with streets, has not a house upon it, and consists entirely of grazing, marsh, and tide lands. It is separated from the Lomita Park tract by the tracks of the Southern Pacific Railroad and of the San Francisco and San Jose Railroad, so that the inhabitants of the Lomita Park tract cannot by any stretch of reasoning be said to be inhabitants of the larger area adjacent. In no reasonable sense can it be said that this tract of land, which from the map appears to be almost if not quite as large as the present city of San Bruno, when regarded as a unit, be said to be inhabited, nor to have any electors within its boundaries to whom the question of its annexation to the city of San Bruno could have been submitted under the terms of the statute of 1889."

In *People* v. *City of Monterey Park,* 40 Cal.App. 715 [181 P. 825], the court affirmed a judgment which held that separate uninhabited areas had been improperly included in a petition for annexation under the 1913 act. The principal area consisted of a "new sewer farm" situated some distance from the city, connected with the city boundary by several narrow strips of land, some of the strips being portions of public streets. "The only inhabitants of the annexation territory were eight persons who lived in three houses, all of which were situated on one acre on the strip lying east of the old sewer farm, at a point 3.54 miles from the north limits of the new sewer farm." It thus appeared that "all of the tracts involved in the annexation territory were uninhabited, except the tract on which said eight persons lived." (P. 720.)

We conclude that in our case the evidence supports a finding that the 2,800-acre tract of land which is permanently covered by the waters of San Pablo Bay is uninhabited, and is a "substantial and clearly separable and distinguishable portion" of the territory proposed for annexation. With these physical characteristics, such a large tract, one which so greatly exceeds in size the inhabited area, can hardly be regarded as so incidental to the inhabited area as to justify a conclusion that the territory proposed to be annexed, regarded as a whole, may fairly be said to be inhabited.

We think the same may be said of the area which is included also in the Richmond annexation territory. It is unin-

habited and is zoned for industry and thus is not legally available for residential use. That is a substantial distinguishing characteristic, not unlike the uninhabited and physically uninhabitable quality of the submerged lands. In either case the condition might change (zoning restrictions might be modified and submerged lands might be filled) but until such a change occurs the distinguishing character of each area continues, if the area continues in fact to be uninhabited. The fact that the industrially zoned area under discussion is bounded by two main line railroads is an added, though not a controlling, circumstance. The presence of the railroads doubtless contributes greatly to make this area peculiarly suitable for industrial uses.

These facts justify the legal conclusion that the inclusion of these two separable and distinguishable uninhabited portions was improper and rendered the San Pablo annexation proceeding void.[2]

In view of this conclusion it is unnecessary to consider the other findings upon which the trial court's conclusion of invalidity was based.

### THE RICHMOND ANNEXATION PROCEEDING

The Richmond annexation proceeding was brought under the provisions of the Annexation of Uninhabited Territory Act of 1939 (Gov. Code, §§ 35300-35326 and §§ 35000-35003).

The county boundary commission approved the proposed boundaries, the petition was circulated, signed and filed, and the city council at a special meeting adopted a resolution

[2]Appellants further state that the San Pablo city council, when it gave consent to the commencement of annexation proceedings, impliedly found that all of the territory in question was inhabited and that such a finding was ''final and conclusive in the absence of a showing that there was an abuse of discretion or fraud on the part of the . . . council in making such finding.''

If appellants are thereby claiming that the character of that territory (inhabited or uninhabited) is not the subject of judicial inquiry in the current actions, they are mistaken. It is an issue under the pleadings. The parties treated it as an issue during the trial. The fact that the 2,800-acre tract of submerged land is an uninhabited, separable and distinguishable portion of the area, appears upon the face of the record. The additional evidence taken by the court (including the testimony of Mr. Finley) went in without objection.

Under the circumstances, it is clear that the issue under discussion is justiciable and that the trial court was entitled to consider all of the evidence introduced thereon. (See *English* v. *City of Long Beach*, 114 Cal.App.2d 311, 316-317 [250 P.2d 298]; *City of Anaheim* v. *City of Fullerton*, 102 Cal.App.2d 395, 401-403 [227 P.2d 494]; *People* v. *City of Monterey Park*, *supra*, 40 Cal.App. 715, 722-723; *Capuchino Land Co.* v. *Board of Trustees*, *supra*, 34 Cal.App. 239.)

fixing the time and place for the hearing of protests to the proposed annexation,—all on March 9, 1953, in the sequence indicated. At its regular meeting held later that day, the city council ratified the action it had taken at the special meeting.

This action, duly and regularly taken, gave Richmond exclusive jurisdiction in view of the invalidity of the San Pablo annexation proceeding.

The trial court concluded that all proceedings had and taken for the annexation of territory to Richmond were valid, regular and in compliance with law.

At the outset of the trial, counsel for San Pablo stated that the only attack they were making upon the Richmond annexation proceeding was (1) that the Richmond proceeding was barred because commenced subsequent to the initiation of the San Pablo proceeding, and (2) the Richmond proceeding was vitiated by fraudulent intent. This, it would appear, as later indicated by the trial court, was still appellants' theory at the conclusion of the taking of evidence.

San Pablo now additionally claims that the petition for annexation to Richmond was insufficient and that Richmond lost jurisdiction because its council did not hear the petition within the prescribed 40-day period. Although these additional points are not properly before us, in view of the theory upon which the case was tried, we have considered them and find them wanting in merit.

*Richmond did not lose jurisdiction for failure to hear the petition within 40 days after March 9th,* the date of passage of the city council's resolution giving notice of the proposed annexation. (See § 35307 as added by Stats. 1949, ch. 79, p. 125.) The resolution of March 9th fixed April 6th at 8 :00 p. m. as the time for the hearing of objections to the proposed annexation. The alternative writ of mandate and the writ of review which issued against the city of Richmond on April 7th, in cases 16118 and 16119, enjoined the city from taking any further steps in the proceeding until 50 days after March 6th or until further order of the court. Those writs were not discharged and the injunctions dissolved until April 29, 1953. Obviously, the running of the 40-day period was tolled during the period of the restraint (April 7th to April 29th) so that if the hearing was not held until May 4, 1953, as appellant contends,[3] it was held in time. So, even if it were an issue in the case, the point would be without merit.

---

[3]There is no evidence as to what happened after April 29th, the last day of the trial.

■ *Appellants further claim that the persons who signed the petition for annexation on behalf of certain corporations owning land in the area, did so without authority* and without attaching the corporate seals; also, that the petition was not signed before a notary public. A complete answer is that each of the signers in question, called to the witness stand by the appellants, as their witness, testified that he was duly authorized to execute the document by the corporation of which he was an officer. As to all but one of them, this testimony was supplemented by documentary evidence of authority. We do not find in the statutes any mandate that requires the affixing of a corporate seal (see Corp. Code, § 801, subd. (b)) or the attachment of a notarial certificate to make the signature to such a petition effective. We conclude that the evidence amply sustains the trial court's finding that the petition was duly executed by the corporate landowners in question.

*Appellants' remaining point is asserted fraud upon the part of the city of Richmond and the landowners who sought annexation to that city.*

In their opening brief appellants say that "at the trial . . . appellants requested leave to amend their petitions to include an allegation of fraud and offered to introduce testimony on that point. The trial court denied the motion . . . and refused to admit the offered evidence." This is assigned as reversible error.

Their petitions did not allege fraud. An allegation that "respondents have acted without and in excess of their powers, authority, and jurisdiction" obviously did not sound in fraud. They did allege that the Richmond proceeding is an invalid attempt "to circumvent the lawful annexation proceedings previously instituted to annex property to the city of San Pablo"; that its effect would be "to annex to . . . Richmond a long narrow strip of territory in an endeavor to prevent the lawful annexation by the City of San Pablo"[4] of certain

---

[4]In making this contention San Pablo is wielding a two-edged sword. It cuts both ways.

Richmond was the first to receive an annexation request, which was put on the agenda for the city council meeting of March 2d. At that meeting, the council referred the request to Richmond's planning commission for report in 30 days.

There is evidence that San Pablo's mayor told his planning commission at its meeting on March 2d that similar proceedings had been started in Richmond and that "the first city that reached a certain point first cut off the other city" and that in order to get the "jump" on Richmond

territory and "to prevent for all times any general westward expansion by the City of San Pablo . . ."

■ That such is the type of asserted fraud of which appellants complain, is emphasized by the amendment to their petitions which they offered and the court refused. The gist of the amendment was that the city of Richmond and the petitioning landowners "commenced and conducted said annexation proceedings for the sole purpose of blocking the City of San Pablo," and that Richmond and said landowners "had no intention of completing said annexation proceedings and have never intended to complete such annexation proceedings."[5]

Such allegations do not present a justiciable controversy. ■ As held in *People* v. *City of Los Angeles,* 154 Cal. 220, 227 [97 P. 311], "there is no law which prohibits another municipality when its present municipal necessities require it, from extending its boundaries by annexation because such extension may possibly prevent future expansion of another municipality." ■ ■ As held in *City of Burlingame* v. *County of San Mateo,* 90 Cal.App.2d 705, 711 [203 P.2d 807],[6] after an extensive review of the authorities, the "wisdom or expediency of the annexation of this territory is not a concern of the courts. We can go no further than to see that existing laws are complied with," and the "motives of the city council of Burlingame [in our case, Richmond] (5 Cal.Jur. 640) or of Mills Estate, Incorporated [in our case, the petitioning landowners] (1 Cal.Jur. 336) cannot be inquired into so long as they proceeded according to established law." (See also *People* v. *Town of Corte Madera,* 115 Cal.App.2d 32, 45-47 [251 P.2d 988].)[7] In the case of Richmond the pertinent limi-

---

it would be necessary for the San Pablo council to have a recommendation from the San Pablo planning commission.

(The extension of San Pablo's boundary westerly to the county line, thus including the 2,800-acre tract of submerged lands, would prevent Richmond from expanding northerly as effectively as would Richmond's annexation strip cut off San Pablo's expansion westerly.)

[5]Incidentally, this alleged intent not to complete the annexation is gainsaid by appellant's argument that consummation was effected after too long a delay in the hearing of protests: "On said May 4, 1953, Richmond first read its Ordinance No. 1398, which ordinance was finally passed and adopted on May 11, 1953; a certified copy of the ordinance was filed with the Secretary of State on May 12, 1953."

[6]A petition for a hearing by the Supreme Court was denied.

[7]An illustration of fraudulent use of the 1939 act which vitiates an annexation proceeding is furnished by *City of Anaheim* v. *City of Fullerton, supra,* 102 Cal.App.2d 395: taking an area that has more than 12 registered electors, dividing it into two parts to keep within that limit

tations imposed by the statute are that the annexed territory must be contiguous to the city (contiguity not to depend upon a strip of land over 300 feet long and less than 200 feet wide) and that less than 12 registered voters reside within it. (§§ 35002.5, 35302, and 35303.) The Richmond annexation territory met these requirements.

## SAN PABLO'S CAPACITY TO SUE

Respondents contend that the city of San Pablo is not a "party beneficially interested" within the meaning of those words as used in sections 1069 and 1086 of the Code of Civil Procedure and therefore has not the capacity to apply for a writ of mandate or of review. They impliedly concede that San Pablo has the legal capacity to be a party defendant in either type of proceeding involving the very same issues. We think San Pablo has very definite justiciable "interests" in the controversy. One is an interest that there be an early determination of the validity and relative priority of each of the proceedings. If each proceeding were to be prosecuted to completion without such a determination, neither city would know which (if either of them, instead of the county) should levy taxes, inspect buildings, collect inspection fees, and furnish fire, police and other governmental services in the disputed area.

Although the capacity of a city thus to participate seems not to have heretofore been expressly questioned and decided, it has been tacitly recognized in such cases as *City of Burlingame* v. *County of San Mateo, supra,* 90 Cal.App.2d 705, and *City of Anaheim* v. *City of Fullerton, supra,* 102 Cal.App. 2d 395. A city's interest in such a case is as real as that of a school district when some of its territory is being annexed to a city. (See *Jefferson Union Sch. Dist.* v. *City Council of Sunnyvale,* 129 Cal.App.2d 264 [277 P.2d 104].)

Each of the judgments is affirmed.

Peters, P. J., and Bray, J., concurred.

Petitions for a rehearing were denied May 20, 1955, and appellants' petition for a hearing by the Supreme Court was denied June 16, 1955. Schauer, J., was of the opinion that the petition should be granted.

as to each part and commencing a separate annexation proceeding for each part, when the two are really one.

A city council's refusal to give protesting landowners a fair hearing was one of the factors that vitiated an annexation proceeding, under the 1913 act, in *Foth* v. *City of Long Beach,* 125 Cal.App.2d 520 [270 P.2d 868].