[Civ. No. 30324. First Dist., Div. 4. Oct. 7, 1975.]

TILLIE·LEWIS FOODS, INC. et al., Plaintiffs and Respondents, v.
CITY OF PITTSBURG et al., Defendants and Appellants;
EL PUEBLO TENANTS COUNCIL et al., Interveners and Appellants.

**COUNSEL**

Alfred A. Affinito, City Attorney, Rutan & Tucker, Milford W. Dahl and James E. Erickson for Defendants and Appellants.

George E. Chaffey and Eugene M. Swann for Interveners and Appellants.

Robert D. Raven, Mark Reutlinger, Morrison, Foerster, Holloway, Clinton & Clark, Morrison & Foerster, Sanders, Scott & Dodson, Sanders, Dodson, Hinton & May, Richard D. Sanders and Stanley K. Dodson for Plaintiffs and Respondents.

**OPINION**

**RATTIGAN, J.**—The two appeals herein are from a single judgment entered by the Contra Costa County Superior Court in two mandamus actions which were tried together pursuant to an order consolidating them for that purpose. The judgment invalidated proceedings which had been commenced for the annexation of certain unincorporated territory to the City of Pittsburg, and directed the issuance of a peremptory writ of mandate which terminated the proceedings. Separate appeals from the judgment have been taken (1) by the city and agencies and officers thereof, all of whom had been named as respondents in each of the actions as commenced; and (2) by inhabitants of the affected territory who appeared and participated in both actions as interveners in each.

Proceedings for the annexation of so-called "inhabited" territory to a city must ordinarily be conducted pursuant to the Annexation Act of 1913 (hereinafter "the 1913 Act"). Where the territory proposed to be annexed is "uninhabited" as that term is defined in the Annexation of Uninhabited Territory Act of 1939 ("the 1939 Act"), proceedings for its annexation are to be conducted pursuant to that Act.[1] As will appear, the

---

[1]Except where otherwise indicated, all statutory references herein are to the Government Code. The 1913 and 1939 Acts are contained in a single chapter thereof (chapter 1 ["Annexation of Territory"] of part 2 ["Alteration of Boundaries"] of division

distinction between "inhabited" and "uninhabited" territory has been historically crucial in annexation proceedings because of substantial differences between the two Acts. As will also appear, these differences have been materially affected by recent changes in the law but the essential distinctions between "inhabited" and "uninhabited" territory, and between the two Acts, have retained their significance.

The principal issue on the present appeals involves the effect of these distinctions when purportedly drawn by a Local Agency Formation Commission ("LAFCO") in the course of its review of a municipal annexation proposal pursuant to the Knox-Nisbet Act.[2] Specifically, the question is whether a LAFCO determination that territory proposed for annexation is "inhabited" is conclusive as a matter of law, and irreversibly requires that the territory be annexed pursuant to the 1913 Act, because the Knox-Nisbet Act so provides; or whether, notwithstanding the latter Act, such determination by LAFCO is subject to judicial review and nullification as a question of fact.

### The Area Involved

The unincorporated territory in dispute is a 459-acre tract of land which is located, generally, to the west of the present westerly boundary of the City of Pittsburg. It is officially designated "Baker Territory No. 5, as amended"; we call it "Baker Territory." Although its zoning, demographic and related features are described in detail in the trial court's findings hereinafter quoted, we preliminarily describe it as follows:

Markedly irregular in shape, the territory lies along an east-west axis which runs in a westerly direction from the Pittsburg city limit for an

2 ["Organization Boundaries"] of title 4 ["City Government"]), to which we herein refer on occasion as "the annexation chapter." The 1913 Act appears as article 2 thereof (commencing with § 35100), the 1939 Act as article 5 (commencing with § 35300).

Neither Act defines "inhabited" territory as such, but section 35303 of the 1939 Act provides that "[f]or purposes of this article [i.e., of the 1939 Act] territory shall be deemed *uninhabited* if less than 12 persons who have been registered to vote within the territory for at least 54 days reside within the territory at the time . . . [proceedings for its annexation are commenced] . . . ." (Italics added.) Although this definition of "uninhabited" territory is limited in terms to the "purposes" of the 1939 Act, it operates, by contrasting implication, to define "inhabited" territory for purposes of the 1913 Act. (Gother, *A Study Of Recent Amendments To California Annexation Laws* (1963) 11 U.C.L.A. L.Rev. 41, 43.)

[2] The Knox-Nisbet Act appears as chapter 6.6 ("Local Agency Formation Commission," commencing with § 54773) of part 1 of division 2 of title 5 of the Government Code.

overall distance of several miles. Its extreme easterly portion, which is contiguous to the city and is itself irregular in shape, includes approximately one-sixth of the land area of the full territory. The easterly portion is comprised of the "El Pueblo" neighborhood and Columbia Park. El Pueblo, a public housing project, is wholly residential. The park is much larger than El Pueblo, and no residences are located in it.

The larger, westerly portion of Baker Territory is connected to the just-described easterly portion by a narrow, mile-long strip which runs west from a corner of Columbia Park. The strip is not residential, and consists in part of a freeway which runs from east to west. The westerly portion of the territory balloons in area at the westerly end of the strip, and extends further west for approximately three miles. The westerly portion is developed and used for industrial purposes; the only residential structures in it are the Betty Ray Motel and two dwellings.

Tillie Lewis Foods, Inc., and Union Carbide Corporation (who were the petitioners for mandate below, and to whom we refer as "petitioners" although they are the respondents on the appeals) own separate parcels of land located in the westerly portion of Baker Territory. Each of petitioners' parcels is improved with valuable industrial buildings.

### The Annexation Proceeding

The Pittsburg City Council, having been requested to annex Baker Territory, submitted a proposal for its annexation to the Contra Costa County LAFCO for its approval pursuant to section 35002.[3] After conducting a hearing and related proceedings required by the Knox-Nisbet Act in connection with such proposals (§ 54791 et seq.), LAFCO adopted a resolution in which it declared that "the territory proposed to be annexed is . . . *inhabited*" (italics added), made no change in its boundaries as proposed, and approved the proposal for its annexation subject to specified "terms and conditions." The "terms and conditions" included a provision which designated the effective date of the annexation "if approved by the voters" as required by the 1913 Act.

---

[3]A proceeding for the proposed annexation of "inhabited" territory under the 1913 Act is formally commenced by the circulation of an annexation petition among the voters residing in the territory. (§§ 35113-35114.) Before this may occur, the city council must give its consent to the proposal (§ 35106) after having first submitted it to the city's planning commission if there is one. (§ 35108.) A proceeding for the proposed annexation of "uninhabited" territory under the 1939 Act is commenced when the owners of not less than one-fourth of the affected land, measured by area and assessed valuation, petition the city council for its annexation. (§ 35305.) Section 35002 appears in article 1 ("General") of the annexation chapter, and therefore reaches the 1913 Act

In a proceeding for the annexation of Baker Territory which was thereupon initiated by the City of Pittsburg pursuant to the 1913 Act,[4] a petition was noticed and circulated among the registered voters residing in Baker Territory; the petition was signed by the requisite number among them, and was returned to the city council; and the council adopted a resolution announcing its intent to call a special annexation election within Baker Territory and setting a hearing at which it (the council) would consider written protests to the annexation filed by owners of land within the territory. (§§ 35111-35117.)

Written protests filed with the council by some of the affected landowners, pursuant to section 35120 as it provided at the time, represented only 43 percent of the value of the real property in Baker Territory according to the measure of such value as then provided in section 35121; as further provided in the latter section at the time, the protests were insufficient to command termination of the annexation proceeding.[5]

---

(art. 2 of the chapter) and the 1939 Act (art. 5) alike. (See fn. 1, *ante.*) It requires that an annexation proposal be submitted to LAFCO for approval before a proceeding may be commenced under either Act, as follows:

"35002. No petition seeking the annexation or transfer of territory to a city shall be circulated or filed, nor shall any public officer accept any such petition for filing, nor shall any legislative body initiate proceedings to annex or transfer on its own motion, until the approval of . . . [LAFCO] . . . is first obtained pursuant to . . . [the Knox-Nisbet Act] . . . ."

This requirement is reiterated in the Knox-Nisbet Act itself, in which the term "[p]roceedings" is defined to include "the procedure authorized and required by any law for the . . . annexation of territory to a local agency . . ." (§ 54775, subd. (j)), the term "local agency" is defined to include "a city" (*ibid.* subd. (h)), and section 54791 provides in pertinent part that "[p]roceedings shall not be initiated until . . . approval is given by . . . [LAFCO] . . . ."

In the present case, the Pittsburg City Council submitted the Baker Territory proposal to the city's planning commission, obtained that body's approval, and adopted a resolution consenting to the proposed annexation, before submitting the proposal to LAFCO. It thus appears that the city, its officers and agencies treated Baker Territory as "inhabited," and subject to annexation under the 1913 Act, at the inception of the proposal and at all times thereafter.

[4]The 1913 Act was followed, after the LAFCO action described, pursuant to section 54797 of the Knox-Nisbet Act. As pertinent here, section 54797 provides: "If the commission [LAFCO] approves a proposal [for the annexation of territory to a city] *proceedings shall thereafter be initiated, conducted and completed pursuant to those provisions of law which are applicable to the proposal as it has been approved by the commission* [i.e., to the 1913 Act or the 1939 Act, as the case might be]. If the commission approves the proposal *with modifications or conditions,* proceedings may be initiated, conducted and completed *only in compliance with such modifications or conditions.*" (Italics added.)

[5]As it then read (but no longer does, having since been declared unconstitutional and repealed as hereinafter discussed), section 35121 provided in pertinent part as follows (italics added):

"35121. At the time set for hearing protests . . . the city legislative body shall hear and

Counsel for petitioner Tillie Lewis Foods, Inc., nevertheless appeared at the protest hearing and demanded that the proceeding be terminated "on the ground that it was being brought pursuant to the Annexation Act of 1913 governing inhabited real property, when in fact the real property sought to be annexed consisted substantially of uninhabited industrial land. . . . [The city] . . . refused to terminate said proceedings." (We here quote the trial court's findings.)

A requisite majority of landowner protests having failed to materialize according to the then-current provisions of the 1913 Act (see fn. 5, *ante*), the Pittsburg City Council conducted an annexation election in Baker Territory pursuant to that Act. (§§ 35122-35133.) The voters approved the annexation by an overwhelming majority. An ordinance approving it was thereupon introduced in the city council pursuant to section 35135.

*The Litigation*

At this point, the petitioners commenced the two mandamus actions. The annexation proceeding was stayed by temporary restraining orders, and by alternative writs of mandate, issued in each action.

In its respective petition for mandate, each petitioner named as "respondents" only the City of Pittsburg, its city council and its planning commission as such, and the individual members of both bodies.[6] The Contra Costa County LAFCO was not named as a party,

---

pass upon all protests . . . made:

"(a) If privately owned property and no publicly owned property is proposed to be annexed, further proceedings shall not be taken if the protest is made by private *owners of one-half of the value of the territory proposed to be annexed.* The value given such property for protest purposes shall be that shown on the last equalized assessment roll. . . .

"(b) If privately owned property and publicly owned property are proposed to be annexed in the same proceeding, further proceedings shall not be taken if protest is made by public and private *owners of one-half of the value of the territory.* The value given privately owned property shall be determined pursuant to subdivision (a) of this section. . . .

"(d) As used in this article [i.e., in the 1913 Act], 'value of the territory' means the *value of the land, exclusive of improvements thereon.* . . .'"

We here meet the critical distinction between former section 35121 of the 1913 Act (just quoted) and the parallel provisions of the 1939 Act which appear in section 35313. The language of subdivisions (a) and (b) of section 35313 was—and still is—substantially identical with the corresponding provisions of former section 35121, but its subdivision (c) provided—as it still does—that "[a]s used in this article [i.e., in the 1939 Act], 'value of the territory' means the *value of land and improvements thereon."* (Italics added.)

[6]We hereinafter refer to these parties, collectively, as "the City."

and did not subsequently appear, in either action. Consistent with this omission, neither petitioner complained of, or mentioned, LAFCO's action approving the proposed annexation of Baker Territory; both petitions were addressed only to the City's actions in treating the territory as "inhabited" for purposes of its annexation.

Each of the petitioners alleged in substance that 400 of the 459 acres in Baker Territory consisted of land which was in fact uninhabited; that the respective petitioner owned land in the uninhabited area; that the area was physically separated from the smaller, inhabited portion of the territory by actual on-the-ground barriers; and that the City's actions, in treating the 400 acres as inhabited territory subject to annexation pursuant to the 1913 Act, were illegal and void. In virtually identical answers filed in the respective answers, the City pleaded material denials and alleged, as an affirmative defense, the LAFCO action approving the annexation.

### The Intervention

At or about the time the City filed its answers, *ex parte* motions for leave to intervene in both actions were made and granted pursuant to section 387 of the Code of Civil Procedure. The interveners were El Pueblo Tenants Council (an unincorporated association composed of residents of the El Pueblo housing project) and three of its members appearing as individuals. In their complaints in intervention, they alleged their support of the annexation of Baker Territory as originally proposed; pleaded as "affirmative defenses" LAFCO's approval of the annexation and various equitable defenses which are not involved on the appeals; and raised a further "affirmative defense" in which they in effect challenged the constitutionality of the 1939 Act as, and if, it were applied to them in connection with the annexation of Baker Territory.[7]

The petitioners having separately answered the complaints in intervention, the two actions were consolidated and tried without a jury.

---

[7]In this regard, the interveners alleged that each of the respective petitioners sought "to require the City . . . to follow a procedure" which would give each of them (the petitioners) "a greater voice in preventing annexation than other citizens who are landowners and/or residents solely because of the value of the improvements" on each petitioner's land. This allegation unmistakably referred to the 1939 Act and its protest procedures. (See fn. 5, *ante.*) The interveners further alleged that such procedure would deny them equal protection of the laws (citing the Fourteenth Amendment of the United States Constitution and article I, sections 11 and 21, of the California Constitution) "in disregard of the constitutionally compelled controlling criterion of population under the 'one man one vote' doctrine and a dilution of interveners' right to vote."

(Some of the testimony received at the trial, which was brief, is hereinafter discussed.) The trial court thereafter filed a memorandum decision in favor of the petitioners, and formal findings of fact and conclusions of law.

In its findings, the court identified the parties and their respective interests, and summarized the annexation proceedings thus far conducted, as described above. Concerning the territory involved, the court found as follows:

"9. Baker Territory . . . consists of approximately 459 acres, 18.6 acres of which are inhabited and is known as El Pueblo. The remaining 440.4 acres are uninhabited with the exception of an insignificant parcel in the north central portion of the area proposed to be annexed. The inhabited area is approximately 4% of the total area proposed to be annexed.

"10. El Pueblo, owned by the Contra Costa County Housing Authority, is zoned multiple residential. Adjacent to El Pueblo is an area known as Columbia Park, also owned by Contra Costa Housing Authority, which consists of approximately 45 acres and is zoned multiple residential. The remainder of the proposed annexation, consisting of approximately 400 acres, is zoned Heavy Industrial and Commercial. 158 acres of the land zoned Heavy Industrial and Commercial are undeveloped. The remainder of the 400 acres is developed for industrial use, contains a substantial number of large and valuable industrial buildings, and is not suitable for residential development.

"11. There are 179 registered voters residing in the area proposed to be annexed, 175 of whom reside in El Pueblo. [¶] 12. There are 14 persons residing outside of El Pueblo. These persons live in the Betty Ray Motel and two houses, which are located in the insignificant parcel in the north central portion of the proposed annexation.

"13. The part of Baker . . . [Territory] . . . zoned and used as industrial land is substantial in area and is separated from the Columbia Park-El Pueblo area by the barriers of recessed State Highway 4, California Avenue, and Kirker Creek. [¶] 14. The uninhabited industrial land is not incidental to the inhabited El Pueblo area."

Among its "Conclusions of Law," the trial court stated: "I. The portion of Baker Territory . . . zoned and used as industrial land is not subject to annexation pursuant to the . . . [1913 Act] . . . dealing with annexation of inhabited land. II. . . . [It] . . . is separate and distinct from

that portion of Baker Territory . . . zoned and used as residential land, and is not subject to annexation pursuant to the . . . [1913 Act] . . . as a part of said inhabited land. III. *The Local Agency Formation Commission does not have the power to declare land which* is uninhabited to be inhabited. . . ."[8] (Italics added.)

The court further concluded that the 1913 Act proceedings were "void," and that judgment should be entered ordering the issuance of a peremptory writ of mandate commanding the City "to terminate proceedings for the annexation of Baker . . . [Territory] . . . as it is presently constituted." Judgment was entered, and the peremptory writ issued, accordingly. The separate appeals from the judgment followed.

### The Contentions On Appeal

The City and the interveners jointly contend that the judgment must be reversed because the Knox-Nisbet Act (1) authorized and empowered LAFCO to determine and declare that Baker Territory was "inhabited," (2) made the determination conclusive as a matter of law, and (3) precludes its being reviewed in the judicial process, with the aggregate result that proceedings for annexation of the territory must be conducted pursuant to the 1913 Act alone. In addition, the interveners have reiterated the constitutional challenge of the 1939 Act which they raised in their complaints in intervention. (See text at fn. 7, *ante.*)

The contentions of both sets of appellants (including the interveners' constitutional point, despite the fact that it may not be decided on their appeal as such)[9] require some analysis of the historical differences between the 1913 and 1939 Acts, the effect of these differences in the

---

[8]The validity of conclusion of law No. III is one of the principal questions before us.

[9]As previously stated, the proceeding terminated by the peremptory writ had been conducted under the 1913 Act. The landowner protests mustered against it, measured by the value of the protestants' land alone (i.e., exclusive of improvements) as required by section 35121 of the 1913 Act as it provided at the time, did not amount to the majority protest which could have terminated the proceeding pursuant to the same section. (See text at fn. 5, *ante.*) The annexation proposal went to an election as provided in the 1913 Act, and the interveners were permitted to vote. The 1939 Act has never been applied to them, nor has it actually affected them, in any respect. Their constitutional challenge of that Act in the trial court (see fn. 7, *ante*) was asserted in terms of its possible application only, and the portended effect of its protest procedures upon the interveners was, and still is, a matter of speculation. Their constitutional challenge was therefore premature in this litigation, and it may not be considered on their appeal for that reason. (*Communist Party* v. *Control Board* (1961) 367 U.S. 1, 71-72 [6 L.Ed.2d 625, 81 S.Ct. 1357]; *In re Cregler* (1961) 56 Cal.2d 308, 313 [14 Cal.Rptr. 289, 363 P.2d 305]; *People* v. *Parker* (1973) 33 Cal.App.3d 842, 849 [109 Cal.Rptr. 354].) Its merits, however, are a relevant feature of the historical discussion which follows in the text.

process of municipal annexation in California, the extent to which they have been affected by intervening developments in the applicable law, and the function of LAFCO in dealing with these matters.

When the issues were originally framed in this case, and at all times before that since the 1913 and 1939 Acts and their respective predecessors were enacted, parallel provisions of both Acts permitted any annexation proceeding to be terminated by a majority protest by the owners of land within the area proposed for annexation. (See former § 35121 of the 1913 Act, and § 35313 of the 1939 Act, as quoted in fn. 5, *ante.*) Landowner protests were weighted for this purpose according to the value of the protestants' affected real property, but subject to the conspicuous differences between the weighting formulas provided in the respective Acts. Although a majority could operate to veto any annexation proceeding by commanding its termination, the dollar amount required to produce this result was measured by the values of the protestants' *land alone* under the 1913 Act but by the aggregate values of their *land and improvements* if the 1939 Act controlled. (See former § 35121, subd. (d), and § 35313, subd. (c), quoted *ibid.*)

By reason of this "curious lack of uniformity" between the two Acts (*Curtis* v. *Board of Supervisors* (1972) 7 Cal.3d 942, 949 [fn. 6] [104 Cal.Rptr. 297, 501 P.2d 537]), the choice between them could control the effectiveness of landowner protests as a veto of any annexation proceeding: as a practical matter, it could predetermine the ultimate question whether dollar values could override the popular will or vice versa. (See Comment, *Municipal Incorporation and Annexation in California* (1957) 4 U.C.L.A. L.Rev. 419, 425-426; Annexation and Related Incorporation Problems in the State of California (1961) 6 Assem. Interim Com. Rep. No. 16, p. 24 [statement by the League of California Cities], pp. 57-58 [statement by the Attorney General]; Gother, *op. cit. supra,* 11 U.C.L.A. L.Rev. 41 at pp. 44-46; LeGates, Cal. Local Agency Formation Commissions (1970 [hereinafter cited as "LeGates"]) pp. 39, 103.)

In a given case, the choice was actually made by the annexation proponents' threshold decision whether the territory proposed for annexation was "inhabited" or "uninhabited" according to the definition of the latter term which appears in section 35303 of the 1939 Act. (See fn. 1, *ante.*) As this decision depended upon where the boundaries of the territory were drawn with respect to where pertinent numbers of

registered voters lived (see *ibid.*), the location of the proposed boundaries had the portentous effects just stated.

The urban, social and economic interests affected by the annexation process were commonly important, frequently enormous, and have consistently collided in the process throughout the decades in which the 1913 and 1939 Acts and their respective statutory predecessors (Stats. 1889, ch. 247, p. 358; Stats. 1899, ch. 41, p. 37) have drawn the all-important distinction between "inhabited" and "uninhabited" territory for purposes of annexation. (See, e.g., *People* v. *Town of·Ontario* (1906) 148 Cal. 625, 634-635, 640-641 [84 P. 205] [modification of opinion], 641-642 [dissenting opinion].) For these reasons, and especially because of the proliferation and growth of California cities during the same period (see Holliman, *Invisible Boundaries And Political Responsibility: A Proposal For Revision Of California Annexation Laws* (1972) 3 Pacific L.J. 533, 533-534), the competing interests mentioned have engaged in a kind of warfare in which the unincorporated suburbs of the state have been both the prize and the battleground, the annexation process a tactic, the location of annexation boundaries a significant weapon, and their calculated manipulation a commonplace event. (For some specific examples of such "manipulation" as attempted in various annexation proceedings, see *Weber* v. *City Council* (1973) 9 Cal.3d 950, 964 [fn. 12] [109 Cal.Rptr. 553, 513 P.2d 601]. See also, generally, LeGates, *op. cit. supra,* at pp. 2-3, 39, 63-64; Goldbach, Boundary Change in Cal.: The Local Agency Formation Commissions (1970 [hereinafter "Goldbach"]) pp. 2-3, 11-12, 97.)

After years of failure to cope with these problems to any meaningful extent (see Comment, *op. cit. supra,* 4 U.C.L.A. L.Rev. 419 at p. 438; Gother, *op. cit. supra,* 11 U.C.L.A. L.Rev. 41 at p. 42; Holliman, *op. cit. supra,* 3 Pacific L.J. 533 at pp. 535-536), the Legislature finally acknowledged "the need for a supra-local agency to intervene in boundary decisions" affecting local governments and, in 1963, established a LAFCO in each county to serve this purpose. (Goldbach, *op. cit. supra,* at p. 7. The precise history of the 1963 legislation which accomplished this, and of the Knox-Nesbit Act which recodified it in 1965, is hereinafter discussed.) The creation of LAFCO was not accompanied by any legislative change in the distinction between "inhabited" and "uninhabited" territory drawn by the 1913 and 1939 annexation Acts, nor in their disparate procedures which determined the effectiveness of landowner protests as a veto of any annexation proceeding (see fn. 5, *ante*); to the contrary, the Acts and their differences were acknowledged

in the provision which presently appears as section 54797 of the Knox-Nisbet Act. (See fn. 4, *ante.*)

The courts had meanwhile refrained from direct engagement in the ongoing municipal "boundary wars," as to "the permissible shape, character or extent" of territory annexed or proposed for annexation to a city, upon the ground that such questions were political rather than judicial. (*People* v. *City of Palm Springs* (1958) 51 Cal.2d 38, 45-46 [331 P.2d 4] and cases there cited.) The courts had freely acted, however, to void various "forms of boundary manipulation" which had been undertaken "for the purpose of circumventing the legislative classification between uninhabited and inhabited territory" created by the 1913 and 1939 Acts. (*Weber* v. *City Council, supra,* 9 Cal.3d 950 at p. 964 [text at fn. 12]; *Meyers* v. *Local Agency Formation Com.* (1973) 34 Cal.App.3d 955, 964 [110 Cal.Rptr. 422].)

In such cases, the courts developed the historic rules (1) that whether territory proposed for municipal annexation was "inhabited" or "uninhabited" presented a question of fact which was subject to judicial determination upon the basis of pertinent evidence (*Johnson* v. *City of San Pablo* (1955) 132 Cal.App.2d 447, 452-453 [283 P.2d 57] and cases there cited; *U. S. Pipe & Foundry Co.* v. *City Council* (1957) 150 Cal.App.2d 630, 633 [310 P.2d 431]; see *City of Port Hueneme* v. *City of Oxnard* (1959) 52 Cal.2d 385, 391 [341 P.2d 318]); and (2) that "[a] proceeding under the 1913 Act is void if it seeks annexation of a substantial area which is *uninhabited* and is clearly *separable* and *distinguishable* from the *inhabited* portions of the lands sought to be annexed." (*U. S. Pipe & Foundry Co.* v. *City Council, supra,* at p. 632. Cf. *Weber* v. *City Council, supra,* 9 Cal.3d 950 at p. 964 [text at fn. 12].)

During the decade or so in which LAFCOs have been functioning, it has apparently remained to be seen whether a LAFCO is empowered —as appellants contend—to perform any discretionary function in connection with "the legislative classification between uninhabited and inhabited territory" established by the 1913 and 1939 Acts (see *Weber* v. *City Council, supra,* 9 Cal.3d 950 at p. 964 [text at fn. 12]) or to ignore the "separable and distinguishable" rule which the pre-LAFCO courts had developed for the purpose of curbing attempted abuses of the classification. (*U. S. Pipe & Foundry Co.* v. *City Council, supra,* 150 Cal.App.2d 630 at pp. 632, 636.)

During the same decade—and during the pendency of the present litigation—the classification itself has been significantly affected by

decisions in which the 1913 and 1939 Acts have been reviewed upon constitutional grounds. We have found it additionally necessary to examine these decisions, in the interests of full perspective and for the purpose of determining whether the classification, and the distinction between the two Acts as a critical factor in the municipal annexation process, have survived as a subject upon which LAFCO is empowered, or not, to take the action which the petitioners challenged in the present case.

The first of these decisions was *Curtis v. Board of Supervisors, supra,* 7 Cal.3d 942, in which section 34311 was held unconstitutional. (*Id.,* at pp. 946, 965-966.) Section 34311 permitted a dollar-measured landowner protest to terminate proceedings for the *incorporation* of a new city within a given territory, and to block a popular election on the question. (*Id.,* at pp. 946-948.) The *Curtis* court held that the legislative classification reflected by the statute was subject to judicial review for compliance with the constitutional guaranties of equal protection. (*Id.,* at p. 951.)

The court further held that the voting rights at stake—i.e., the right to vote which the incorporation laws guaranteed to the affected·electors if not blocked by landowner protest pursuant to section 34311—were of such fundamental importance that the effect of the statutes in abridging them could be justified only if it were necessary to the furtherance of a "compelling state interest" as shown under the "strict standard" of review which applied in cases of such "suspect classification." (*Curtis v. Board of Supervisors, supra,* 7 Cal.3d 942 at pp. 951-955.) Applying the "strict standard" accordingly, the court invalidated section 34311 for want of such "compelling state interest" in the process of municipal incorporation. (*Id.,* at p. 965.)

Because territory subject to the *incorporation* process is necessarily "inhabited" (see § 34302), proceedings for incorporation do not involve the distinction between "inhabited" and "uninhabited" territory drawn in the 1913 and 1939 Acts which alternatively control the process of *annexation.* Former section 35121 of the 1913 Act was nevertheless indistinguishable from section 34311, in· that it also permitted a dollar-measured landowner protest to block an election, otherwise guaranteed to the affected registered-voter residents by the 1913 Act, on the question whether "inhabited" territory should be annexed to a city. (See former § 35121 as quoted in fn. 5, *ante.*) For this reason, the inevitable demise of section 35121 upon *Curtis* grounds has materialized: it has also been declared unconstitutional. (*Levinsohn v. City of San Rafael* (1974) 40 Cal.App.3d 656, 658-659 [115 Cal.Rptr. 309].)

The 1974 Legislature, explicitly acknowledging *Curtis* and doubtless anticipating *Levinsohn,* repealed former section 35121 outright (Stats. 1974, ch. 478, § 8, p. 1138)[10] and has appropriately amended the 1913 Act so that a landowner disaffected by a proceeding for the annexation of "inhabited" territory may no longer "protest" the annexation; he may "request . . . exclusion of his property" from the territory involved, and the legislative body of the city is alone empowered to terminate the proceeding or to make limited changes in the boundaries of the territory as proposed. (See present §§ 35117, 35120 and 35121.5.) The provisions of the 1913 Act which call for the final decision on annexation to be made at a popular election in the "inhabited" territory have been retained intact. (§§ 35122-35133.)

Meanwhile, the 1939 Act survived a related constitutional challenge in *Weber* v. *City Council, supra,* 9 Cal.3d 950. That case involved proceedings commenced under the 1939 Act for the proposed annexation to a city of territory which was "uninhabited," by statutory definition, because only two persons resided in it. (See § 35303 as quoted in fn. 1, *ante* ["less than 12"]; *Weber* v. *City Council, supra,* at p. 953.) They sought a writ of mandate requiring termination of the proceedings upon the ground that the 1939 Act was unconstitutional because it permitted the annexation of their land to the city without giving them the right to vote on the question at all. (*Weber* v. *City Council, supra,* at pp. 954-955.)

The *Weber* court held that this challenge distinguished *Curtis,* in that no otherwise-guaranteed voting rights were at stake under the 1939 Act, which provided for no election at all (*id.,* at pp. 960-961); that the Act was therefore not subject to the "strict standard" of review for compliance with equal protection requirements (*id.,* at p. 961); and that it was constitutional, under the "traditional" standard of review for the purpose, because the conceptual distinctions between inhabited and uninhabited territory demonstrated that the classification effected by the Act bore a "rational relationship to a legitimate state end." (*Id.,* at pp. 961-964.) Specifically, the court further held that "[t]he definition of 'inhabited territory' in the 1939 Act (§ 35303) is sufficiently related to legitimate legislative purposes to satisfy equal protection requirements."

Thus, as the combined result of *Curtis, Levinsohn,* and the 1974 legislation mentioned (see text at fn. 10, *ante*), the 1913 Act continues to

---

[10]In the 1974 enactment, "[t]he Legislature finds and declares that the purpose of this act is to codify the 1972 decision of the California Supreme Court in *Curtis* v. . . . *Board of Supervisors* and therefore is not a change in existing law." (Stats. 1974, ch. 478, § 1, p. 1137.)

control a proceeding for the annexation of "inhabited" territory but the inhabitants are guaranteed the right to vote on the question, notwithstanding landowner dissidence, if the proceeding runs its full course. According to the *Weber* decision, on the other hand, the definition of "uninhabited" territory which appears in section 35303 of the 1939 Act is valid (see fn. 1, *ante*), the 1939 Act continues to control the annexation of "uninhabited" territory (so defined) and to permit it without an election, and ' disaffected landowners may still terminate a 1939 Act proceeding with a majority protest weighted by the values of their *land and improvements* as provided in section 35313 thereof.[11] (See fns. 6 and 9, *ante.*)

■ The judgment under review in the present case recognizes the still-existent distinction drawn between "inhabited" and "uninhabited" territory by the 1913 and 1939 Acts, respectively. It also rests upon the aforementioned historic rules that territory which is judicially determined to be "uninhabited" *in fact* may not be annexed under the 1913 Act as an appendage to "inhabited" territory from which it is "separable and distinguishable" *in fact. (U. S. Pipe & Foundry Co.* v. *City Council, supra,* 150 Cal.App.2d 630 at pp. 632-633.)

The trial court's findings in this regard (quoted *ante*) are supported by substantial evidence. The judgment must therefore be affirmed (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]) unless—as appellants contend—the Knox-Nisbet Act must be interpreted (1) as having empowered LAFCO to determine that a given area is "inhabited" territory subject to annexation under the 1913 Act alone, and (2) as having abrogated the historic "separable and distinguishable" rule *(U. S. Pipe & Foundry Co.* v. *City Council, supra,* 150 Cal.App.2d 630 at pp. 632-633) by insulating the LAFCO determination from judicial review. We hold that the Knox-Nisbet Act may not be so interpreted: we affirm the judgment.

*The Language Of The Knox-Nisbet Act*
*Relative To LAFCO's "Purposes" And "Powers"*

■ "A local agency formation commission, commonly referred to as LAFCO, is a creature of the Legislature and has only those express (or necessarily implied) powers which are specifically granted to it by

---

[11]The constitutional validity of the protest procedure provided in section 35313 of the 1939 Act was not before the *Weber* court, which took pains to say so (*Weber* v. *City Council, supra,* 9 Cal.3d 950 at p. 961 [fn. 10]), and it is not before us on the present appeals. (See fn. 9, *ante.*)

statute." (*City of Ceres* v. *City of Modesto* (1969) 274 Cal.App.2d 545, 550 [79 Cal.Rptr. 168]; *Bookout* v. *Local Agency Formation Com.* (1975) 49 Cal.App.3d 383, 387 [122 Cal.Rptr. 668].) It has been stated that the *City of Ceres* decision, *supra,* and one other (*San Mateo County Harbor Dist.* v. *Board of Supervisors* (1969) 273 Cal.App.2d 165 [77 Cal.Rptr. 871]) support the conclusion that LAFCO decisions are subject to judicial review only "on rare occasions," but that these include "attempts by the LAFCOs *to go considerably beyond their express statutory grant of authority.*" (Italics added.) (Note (1972) 23 Hastings L.J. 913, 924 [fn. 119].)

Although appellants concede that no section of the Knox-Nisbet Act *expressly* empowers LAFCO to determine that an area proposed for annexation is "inhabited" or "uninhabited" territory within the meaning of the legislative classification, they contend in effect that such power is to be discerned by necessary inference from various passages in the Act. They cite a host of its sections for this purpose, but they principally refer to the passage in section 54774 (the preamble of the Act) which states: "Among the purposes of a local agency formation commission are the discouragement of urban sprawl and the encouragement of the orderly formation and development of local governmental agencies based upon local conditions and circumstances."[12]

This language, appellants assert, bespeaks the Legislature's acknowledgment of the problems encountered with the interplay of the 1913 and 1939 Acts in the long and disorderly history of the municipal annexation process prior to 1963 as previously discussed herein, and the legislative intent that the Knox-Nisbet Act terminate these problems by vesting in LAFCO the conclusive and irreversible power to determine whether the 1913 Act or the 1939 Act would control a given annexation proceeding.

Appellants also find such legislative intent in sections of the Knox-Nisbet Act which define the "powers" of LAFCO in reviewing annexation proposals presented to it (§ 54790)[13] and the guidelines it is to follow

---

[12]The remaining language of section 54774 speaks to LAFCO's "objects" and "powers" with respect to the conduct of continuing "studies" of local government conditions for various purposes. Because the "study" phase of LAFCO's functions and powers are not involved on the present appeals, the full text of section 54774 need not be quoted.

[13]As it read when the events of the present controversy occurred, and in pertinent part, section 54790 provided as follows:

"54790. The commission [LAFCO] shall have the following powers and duties, subject to the limitations upon its jurisdiction herein set forth:

"(a) To review and approve or disapprove with or without amendment, wholly,

in its review (§ 54796),[14] and in the language of section 54797 which directs that, once LAFCO has approved an annexation proposal, "proceedings shall thereafter be initiated, conducted and completed pursuant to those provisions of law [i.e., the 1913 Act or the 1939 Act] which are applicable to the proposal as it has been approved by the commission [LAFCO]." (See fn. 4, *ante.*)

The first basis of our disagreement with appellants' interpretation of these sections involves the legislative origins of LAFCO and of the Knox-Nisbet Act, whose histories are separate and distinct. As we have previously indicated, the 1963 legislation which created a LAFCO in each county was recodified by the 1965 Legislature. The process involved

partially or conditionally proposals for: . . . (3) The annexation of territory to local agencies . . .

"(b) To adopt standards and procedures for the evaluation of proposals.

" . . . . . . . . . . . . . . . .

"(f) To review the boundaries of the territory involved in any proposal with respect to the definiteness and certainty thereof, the nonconformance of proposed boundaries with lines of assessment or ownership, and other similar matters affecting the proposed boundaries.

"(g) To waive the restrictions of Section 34312 and of subdivision (1) of Section 35002.3, and Sections 35158 and 35326 if it finds that the application of the restrictions would be detrimental to the orderly development of the community and that the area that would be enclosed by the annexation . . . is so located that it cannot reasonably be annexed to another city or incorporated as a new city."

Among the statutes whose "restrictions" LAFCO is expressly permitted to waive in subdivision (g), one (§ 34312) pertains to the process of municipal incorporation alone. The other three (§§ 35002.3, 35158, 35326) impose "restrictions" upon annexation in peculiar geographical situations encountered in some instances. Section 35002.3 appears in article 1 ("General") of the annexation chapter; section 35158, in the 1913 Act (article 2 of the chapter); section 35326, in the 1939 Act (article 5).

[14]When the events in controversy occurred, and as pertinent, section 54796 provided:

"54796. Factors to be considered [by LAFCO] in the review of a proposal shall include but not be limited to:

"(a) Population, population density; land area and land use; per capita assessed valuation; topography, natural boundaries, and drainage basins; proximity to other populated areas; the likelihood of significant growth in the area, and in adjacent incorporated and unincorporated areas, during the next 10 years.

"(b) Need for organized community services; the present cost and adequacy of governmental services and controls in the area; probable future needs for such services and controls; probable effect of the proposed . . . annexation . . . and of alternative courses of action on the cost and adequacy of services and controls in the area and adjacent areas. . . .

"(c) The effect of the proposed action and of alternative actions, on adjacent areas, on mutual social and economic interests and on the local governmental structure of the county.

"(d) The definiteness and certainty of the boundaries of the territory, the nonconformance of proposed boundaries with lines of assessment or ownership, the creation of islands or corridors of unincorporated territory, and other similar matters affecting the proposed boundaries."

its repeal and reenactment with additional language, new section numbers, and various other changes.

The 1963 legislation did not include the present short title or preamble of the Knox-Nisbet Act, both of which were added by the 1965 Legislature in present sections 54773 and 54774, respectively. It did include provisions which (1) vested in LAFCO the power "[t]o review and approve or disapprove with or without amendment, wholly, partially, or conditionally," proposals for the annexation of territory to a city; (2) established guidelines to be followed by LAFCO in evaluating such proposals; and (3) required that proceedings for a LAFCO-approved annexation proposal be conducted under the 1913 Act or the 1939 Act, as appropriate. In the 1965 recodification, and without substantive change in any instance, these three provisions respectively emerged in the Knox-Nisbet Act as sections 54790, subdivision (a), section 54796, and section 54797.[15] (See fns. 13, 14, and 4, *ante.*)

As created by the 1963 legislation which included the predecessors of these sections, LAFCO was *not* empowered to make a determination that territory proposed for annexation was "inhabited" or "uninhabited" and, in consequence, whether the 1913 Act or the 1939 Act would control the annexation proceeding when LAFCO had approved the proposal. (Gother, *op. cit. supra,* 11 U.C.L.A. L.Rev. 41 at p. 46.)[16] We perceive nothing in the 1965 recodification (i.e., in the Knox-Nisbet Act) which may be interpreted as having vested LAFCO with a power which it had not previously held in this regard.

---

[15]For the complicated legislative histories summarized here, see Stats. 1963, ch. 1808, §§ 1 (pp. 3657-3662), 2 (p. 3662); Stats. 1963, ch. 1810, §§ 1 (pp. 3666 [§ 54760], 3667 [§ 54765], 3667-3668 [§ 54766]), 2 (pp. 3668-3669); Stats. 1965, ch. 587, §§ 9 (p. 1916), 10 (pp. 1919 [§ 54790] and 1921 [§§ 54798, 54799]), 14 (p. 1924); Stats. 1965, ch. 2045, §§ 16 (pp. 4776-4777), 20.7 (p. 4779), 21 (pp. 4779-4780), 25 (p. 4781).

[16]For purposes of the present controversy, the source here cited was explicit. Having analyzed the 1963 legislation which created LAFCO, the author stated: "The existence of the Local Agency Formation Commission and the necessity of obtaining its approval [of an annexation proposal] *will have little effect on the question of inhabited versus uninhabited territory. The Commission is not empowered to make such a determination,* nor is this distinction listed [in the predecessors of present section 54796] as one of the factors that the Commission should consider, except perhaps by implication from the fact that the 'population' of the territory is listed as one factor. However, *the possibility that the proceeding would eventually be set aside by judicial decision, because of the method of drawing the boundaries in an attempt to control the number of persons residing in the area,* might well be a significant factor to be considered by the Commission in approving or disapproving an annexation." (Italics added.) This passage has been quoted with approval by at least one Court of Appeal. (*Meyers v. Local Agency Formation Com., supra,* 34 Cal.App.3d 955 at p. 961 [fn. 5].)

Present section 54774 of the Knox-Nisbet Act, first enacted as its preamble in 1965, did not have this effect as appellants contend: its broad statement of some of LAFCO's *purposes* (". . . the discouragement of urban sprawl and the encouragement of the orderly formation and development of local governmental agencies . . .") may not be read as adding to the *powers* which the Legislature had delegated to it in 1963. ■ " '. . . [F]ailure to make changes in a given statute in a particular respect when the subject is before the Legislature, and changes made in other respects, is indicative of an intention to leave the law unchanged in that respect.' [Citations.]" *(Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 65 [81 Cal.Rptr. 465, 460 P.2d 137]; *Estate of McDill* (1975) 14 C.3d 831, 838 [122 Cal.Rptr. 754, 537 P.2d 874].)

Appellants contend that LAFCO has the irreversible "power" to determine that territory is "inhabited" or "uninhabited" upon the stated basis that the Knox-Nisbet Act authorizes it "to *establish* city annexation boundaries." (The last-quoted passage is taken from both opening briefs, with italics added.) This argument has no factual application in the present case because the Contra Costa County LAFCO took no action to "establish" the boundaries of Baker Territory: in approving the City's proposal for annexation of the territory, it accepted the boundaries proposed.

The argument also fails in principle. Section 54790 of the Knox-Nisbet Act, in which LAFCO's express powers are enumerated (see fn. 13, *ante),* authorizes it, in subdivision (a), "[t]o review and approve or disapprove with or without amendment, wholly, partially or conditionally, proposals for . . . annexation of territory" to a city. (See *ibid.)* It has been held to be "eminently clear," from this "plain language . . . when read in conjunction with sections 54791 and 54792, that the extent of LAFCO's power is to approve or disapprove 'wholly, partially or conditionally' *actual* and *precise* proposals which are presented to it . . . for its consideration." *(City of Ceres* v. *City of Modesto, supra,* 274 Cal.App.2d 545 at p. 553 [original italics; fn. omitted].)

Thus, it is the function of an annexation's proponents to "establish" boundaries, in the first instance, by submitting an "actual and precise" boundary proposal to LAFCO for its approval. It is true that LAFCO may "establish" *new* boundaries by altering those proposed pursuant to its power to approve a proposal "with . . . amendment."[17] (§ 54790, subd.

---

[17]Such action, taken on an "ad hoc" and case-by-case basis, has been a common occurrence in the LAFCO experience. (See, e.g., LeGates, *op. cit. supra,* at pp. 64-65.)

(a).) A given "amendment" of boundaries by LAFCO may have the effect of changing the affected area from "inhabited" to "uninhabited" territory (or vice versa) according to the definition of "uninhabited" territory which appears in section 35303 of the 1939 Act.[18] Where this occurs, however, it is by operation of the section 35303 definition upon the actual fact of the population involved; its occurrence does not mean that LAFCO's power to change the boundaries includes the power to change that fact by declaring the contrary.

By our reading of the various sections of the Knox-Nisbet Act upon which appellants rely for their interpretation of LAFCO's powers, the Act both authorizes and directs LAFCO to review an annexation proposal in a manner consistent with the Legislature's statement of its (LAFCO's) purposes in section 54774 and with the factors it must consider in the process as required by section 54796. It thus appears that the language of these sections, and of the Knox-Nisbet Act at large, was employed by the Legislature for the purposes of vesting LAFCO with substantial authority and discretion to review annexation proposals (§ 54790, subd. (a)) in keeping with specified public purposes (§ 54774); of providing it with broad objectives and detailed guidelines to be considered in the exercise of its authority and discretion (§§ 54774, 54796); and of mandating that the result of its actions be implemented pursuant to the alternatively appropriate annexation procedure provided by the 1913 Act or the 1939 Act, as the result might warrant. (§ 54797; see fn. 18, *ante.*)

It does not follow, however, that the same language evidenced a legislative intent to commit the most critical determination in the annexation process—the distinction between "inhabited" and "uninhabited" territory—to the unbridled discretion of LAFCO. Such intent would have been wholly inconsistent with the facts that, when it created LAFCO in 1963 and adopted the Knox-Nisbet Act in 1965, the Legislature preserved the distinction as it had been established, historically, by the 1913 and 1939 annexation Acts; left unchanged the definition of "uninhabited" territory, in section 35303 of the 1939 Act, which controlled the application of the distinction in any annexation

---

[18]In our view, this prospect explains section 54797. Thus, a proposal whose boundaries delineate territory which is "inhabited" *in fact*, and subject to annexation under the 1913 Act in consequence, may emerge from LAFCO with its approval but with new boundaries which operate to make the area "uninhabited" *in fact* and subject to annexation under the 1939 Act (or vice versa); and the Legislature enacted section 54797 to insure that the subsequent proceeding followed the law which controlled the emergent facts. This means that LAFCO may control the facts, in a sense, but not—as appellants in effect contend—that it is empowered to ignore them.

proceeding (see fn. 1, *ante*); and actually incorporated the distinction itself into the Knox-Nisbet Act by providing in section 54797 that it applied, in any case, to control the proceedings which followed LAFCO approval of an annexation proposal.[19] (See fns. 4 and 18, *ante.*)

Nor does it follow that the broad language of the Knox-Nisbet Act imports a legislative intent to abrogate the historic rule that the distinction between "inhabited" and "uninhabited" territory presents a question for factual determination which is subject to judicial review in the final analysis. (*Johnson* v. *City of San Pablo, supra,* 132 Cal.App.2d 447 at pp. 452-453 and cases cited; *U. S. Pipe & Foundry Co.* v. *City Council, supra,* 150 Cal.App.2d 630 at p. 633.) The Legislature is presumed to have been aware of the many judicial decisions reiterating this rule when it enacted the 1963 LAFCO legislation and the 1965 recodification, and to have considered those decisions on both occasions. (*Buckley* v. *Chadwick* (1955) 45 Cal.2d 183, 200 [288 P.2d 12, 289 P.2d 242]; *Bishop* v. *City of San Jose, supra,* 1 Cal.3d 56 at p. 65; *Estate of McDill, supra,* 14 Cal.3d 831 at p. 839.) Nevertheless, the Knox-Nisbet Act includes no express provision which may be construed as affecting the rule mentioned or its application in annexation proceedings. Given the clear purposes of its sections as interpreted above (§§ 54774, 54790 [subd. (a)], 54797), we find no such effect implied in them. Construing the Knox-Nisbet Act at large, we may not "insert what has been omitted" from it. (Code Civ. Proc., § 1858. Cf. *Estate of Simmons* (1966) 64 Cal.2d 217, 221 [49 Cal.Rptr. 369, 411 P.2d 97]; *Sacramento Typographical Union No. 46* v. *State of California* (1971) 18 Cal.App.3d 634, 639 [96 Cal.Rptr. 194].)

Finally, the Knox-Nisbet Act charges LAFCO with the function of acting as the Legislature's " 'watchdog' " in reviewing "actual and precise" proposals for annexation which are submitted to it. (*City of Ceres* v. *City of Modesto, supra,* 274 Cal.App.2d 545 at p. 553; *Bookout* v. *Local Agency Formation Com., supra,* 49 Cal.App.3d 383 at p. 388.) Its proper performance of this function will discourage the sponsors of a proposal from engaging in the aforementioned practice of boundary

---

[19]We have seen that in section 54790, subdivision (g) of the Knox-Nisbet Act, the 1965 Legislature expressly authorized LAFCO to "waive" certain "restrictions" imposed upon the annexation process by other statutes, two of which (§§ 35158 and 35326) then appeared—as they still appear—in the 1913 and 1939 annexation Acts, respectively. (See fn. 13, *ante.*) Although the waiver power was thus expressly directed to some specified provisions of both Acts, it was not extended to the point that LAFCO was authorized to "waive" any "restrictions" necessarily imposed by the distinction between "inhabited" and "uninhabited" territory as drawn by the two Acts. For present purposes, the omission appears to have been both intentional and significant.

manipulation, with the objective of bringing the affected territory within the purview of one annexation Act or the other for spurious political purposes, because LAFCO may disapprove a proposal where this occurs (Gother, *op. cit. supra,* 11 U.C.L.A. L.Rev. 41 at p. 46 [quoted in fn. 16, *ante*]) or it may redraw the proposed boundaries by way of amendment or as a condition of its approval. (§ 54790, subd. (a); see text at fn. 17, *ante.*)

There is nothing in the Knox-Nisbet Act, however, which restrains the proponents of an annexation from attempting the fraudulent manipulation of boundaries in drafting their proposal in the first instance. Appellants' view of LAFCO's power would permit it to become a party to the manipulation game by rubber-stamping spurious boundaries. This prospect is totally at odds with the concept that a principal purpose of LAFCO is to frustrate such manipulation. (See § 54774; Goldbach, *op. cit. supra,* at p. 7.) One court, in fact, construing the Knox-Nisbet Act, has expressly stated: "It appears . . . that LAFCO should remain free from entanglement in the legal cobwebs spawned by such considerations as manipulation of boundaries and fraudulent circumvention of the 1939 Act for the purpose of depriving residents of their right to vote and that these legal questions, *absent express statutory authority, would be better left to the courts.*" (*Meyers* v. *Local Agency Formation Com., supra,* 34 Cal.App.3d 955 at pp. 960-961 [italics added; fn. omitted].)

### The Testimony Of Assemblyman Knox

■ The City called Assemblyman John T. Knox at the trial. Mr. Knox was the principal author of both the 1963 LAFCO legislation and the Knox-Nisbet Act adopted in 1965 (and which bears his name). The City's counsel flatly asked him whether it had been "the intent of the Legislature in passing the Knox-Nisbet Act to allow LAFCO to have broad discretion in granting annexation of territories." The trial court sustained the petitioners' objections to this question, and to any testimony by Mr. Knox as to "legislative intent." The court's rulings were clearly correct: it has been held that the testimony or opinions of individual legislators are inadmissible "for the purpose of showing what in fact was intended or meant" by a given enactment (*Bagg* v. *Wickizer* (1935) 9 Cal.App.2d 753, 758 [50 P.2d 1047]; *Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 603 [45 Cal.Rptr. 512]; *Bragg* v. *City of Auburn* (1967) 253 Cal.App.2d 50, 54 [61 Cal.Rptr. 284]), and that the courts will place little or no reliance upon such evidence in any event. (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247,

258 [104 Cal.Rptr. 761, 502 P.2d 1049]; *Bauman* v. *Islay Investments* (1973) 30 Cal.App.3d 752, 756 [106 Cal.Rptr. 889].)

The trial court then permitted Assemblyman Knox to be examined within the narrow limits of the content of the "legislative debates" which attended the enactment of the original LAFCO legislation in 1963 and of the Knox-Nisbet Act in 1965. While this action was also correct (*Rich* v. *State Board of Optometry, supra,* 235 Cal.App.2d 591 at p. 603), the witness' ensuing testimony was essentially unfruitful. In fact, in its only content of present significance, Mr. Knox positively affirmed that "the existing law as to what was uninhabited or inhabited land [i.e., the 1913 and 1939 annexation Acts] was certainly known" to the Legislature when the LAFCO laws in controversy were enacted. We find nothing in his testimony to support appellants' present contention that the Knox-Nisbet Act empowers LAFCO to draw the inhabited-versus-uninhabited distinction by declaration which may not be judicially reviewed; the last-quoted passage tends to refute it.

### The Effect Of Subsequent Legislation

■ Appellants further contend that the power claimed for LAFCO has been established by subsequent legislation. They refer to present section 35002.1, which was enacted by the 1971 Legislature (Stats. 1971, ch. 487, § 1, p. 971), and which took effect March 4, 1972 (*id.* p. A-3), *after* all the pertinent events of the present controversy had occurred.[20] Their contention rests upon the alternative premises, both of which are urged, (1) that the section, when enacted, was "declaratory of existing law" which was already expressed in section 54797 as to the power appellants claim for LAFCO; or (2) that, if not, it vested the power in LAFCO when it was enacted and was retroactive in effect. The contention must be rejected because both premises fail.

---

[20]Section 35002.1 provides: "The territory in an annexation proposal approved by the local agency formation commission *pursuant to Section 54797 shall be deemed a single area* for purposes of determining the manner in which annexation proceedings shall be initiated and conducted pursuant to the provisions of this chapter [i.e., of the Knox-Nisbet Act]." (Italics added.)

It should be mentioned in passing that both sets of appellants, noting that the bill which produced section 35002.1 was introduced and carried to enactment by Assemblyman Knox, attempt the argument that he—and therefore the bill, and the section—were motivated by the result reached by the trial court in the present case. The argument is utterly unsupported by the record, and the motive claimed would be immaterial in any event. (*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d 247 at pp. 257-258; *Bauman* v. *Islay Investments, supra,* 30 Cal.App.3d 752 at p. 756.)

As we have seen, section 54797 has provided at all pertinent times that annexation proceedings shall be "initiated, conducted and completed" pursuant to either the 1913 Act or the 1939 Act, depending upon whether the affected territory is "inhabited" or "uninhabited" *in fact,* after LAFCO has approved a given annexation proposal. (See fns. 4 [quoting § 54797] and 18, *ante.*) We have also seen that section 54797, whether read alone or in the full context of the Knox-Nisbet Act, may not be construed as vesting LAFCO with the power to make an irreversible determination, that the territory is "inhabited" or "uninhabited," in contradiction of the actual *fact.* (See fn. 18, *ante.*)

Section 35002.1 requires that the territory "shall be deemed a single area" for the purpose of determining which annexation Act shall apply after LAFCO has approved a proposal. (See fn. 20, *ante.*) This means that section 35002.1 is intended to prevent an annexing city from circumventing the requirement and effect of section 54797 by dividing the territory, after LAFCO has approved its annexation, and proceeding under both annexation Acts rather than the appropriate single one. It thus appears that section 35002.1 was enacted to insure strict compliance with section 54797 in the conduct of a LAFCO-approved annexation proceeding, but that it was not intended to be "declaratory of existing law" as to any powers already vested in LAFCO at the time of its enactment.

Pursuing its "declaratory of existing law" premise, the City states that "[t]he provisions of the newly enacted Section 35002.1 are nothing more than a restatement in different terms of the existing provisions of Section 54797." This assertion is defeated by pertinent canons of statutory construction. *"An intention to change the law* is indicated by a material change in the language of a statute [i.e., in the present context, the language of the Knox-Nisbet Act]. [Citation.] ' "The very fact that the prior act is amended *demonstrates the intent to change the pre-existing law,* and the presumption must be that it was intended to change the statute in all the particulars touching which we find a material change in the language of the act." ' [Citations.]" (*Van Nuis* v. *Los Angeles Soap Co.* (1973) 36 Cal.App.3d 222, 228 [111 Cal.Rptr. 398] [italics added].) As we have just seen, section 35002.1 appears to have been a "material change," if a minor one, in the Knox-Nisbet Act. We are not persuaded that the 1971 Legislature should have felt constrained to add it to the Act if, as appellants contend, it amounted to "nothing more than a restatement in different terms" of the pre-existing section 54797.

As to the City's second premise, and even if the enactment of section 35002.1 had the substantive effect of vesting LAFCO with the new power appellants claim for it, the enactment cannot be construed as having operated retroactively. The rules relating to the retroactive application of statutes are, of course, well settled. ■ As a general rule, a statute will not be construed to operate retroactively unless the legislative intent cannot be otherwise satisfied (*Balen* v. *Peralta Junior College Dist.* (1974) 11 Cal.3d 821, 828; *Interinsurance Exchange* v. *Ohio Cas. Ins. Co.* (1962) 58 Cal.2d 142, 149). The Legislature, of course, is well acquainted with this fundamental rule, and, when it intends a statute to operate retroactively, it uses clear language *in the statute* to accomplish that purpose. Consequently, where the language used by the Legislature has not clearly shown that retroactive application was intended, the rule against retroactive construction has uniformly been upheld (*Balen* v. *Peralta Junior College Dist., supra; DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167, 176; *Caminetti* v. *Pac. Mutual L. Ins. Co.* (1943) 22 Cal.2d 344, 353). There is nothing in the 1971 enactment of section 35002.1 to indicate that the Legislature intended it to operate retroactively. (See Stats. 1971, ch. 487, p. 971.)

### The Construction Of The
### Knox-Nisbet Act By LAFCO Itself

The City also argues that we should interpret the Knox-Nisbet Act as vesting in LAFCO the power claimed for it because the Contra Costa County LAFCO reached that interpretation in the present case. The argument invokes the rule that the construction of a statute, by those charged with its enforcement and administration, is entitled to "great weight" in its interpretation by the courts. (See, e.g., *Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 681 [94 Cal.Rptr. 279, 483 P.2d 1231].)

In *Meyer* v. *Board of Trustees* (1961) 195 Cal.App.2d 420 [15 Cal.Rptr. 717], cited by the City on this point, the court stated the rule mentioned and added that it rests upon the presumption that an extralegislative interpretation of a statute "has come to the attention of the Legislature, and if it were contrary to the legislative intent that some corrective measure would have been adopted in the course of . . . enactments on the subject in the meantime." (*Id.,* at p. 432.) In *Meyer,* however, an interpretation of the statute in question had been expressed in a formal opinion by the Attorney General which was readily cognizable by the Legislature. (*Id.,* at pp. 430-431, 432.)

There is no evidence in the present record that any LAFCO or other source had previously interpreted the Knox-Nisbet Act as the Contra Costa County LAFCO did in the present case; thus, the presumption of implicit legislative recognition mentioned in the *Meyer* decision has no application here. ■ The rule which does apply on the City's point was stated by the *Mooney* court as follows: " 'While the construction of a statute by officials charged with its administration, *including their interpretation of the authority invested in them to implement and carry out its provisions,* is entitled to great weight, nevertheless "Whatever the force of administrative construction . . . *final responsibility for the interpretation of the law rests with the courts.*" [Citation.]' " (*Mooney* v. *Pickett, supra,* 4 Cal.3d 669 at p. 681 [italics added].)

For all of the foregoing reasons, the trial court correctly concluded that under the Knox-Nisbet Act "[t]he Local Agency Formation Commission does not have the power to declare land which is uninhabited to be inhabited" in reviewing its proposed annexation to a city. (See text at fn. 8, *ante.*)

The judgment is affirmed.

Caldecott, P. J., and Christian, J., concurred.

Petitions for a rehearing were denied November 6, 1975, and the petitions of all the appellants for a hearing by the Supreme Court were denied December 17, 1975.