[L.A. No. 31283. Jan. 19, 1981.]

CALIFORNIA TEACHERS ASSOCIATION,
Plaintiff and Appellant, v.
SAN DIEGO COMMUNITY COLLEGE DISTRICT et al.,
Defendants and Appellants.

COUNSEL

Laurence D. Steinsapir, Robert M. Dohrmann, Howard M. Knee and Schwartz, Steinsapir, Dohrmann & Krepack for Plaintiff and Appellant.

Donald L. Clark, County Counsel, Lloyd M. Harmon, Jr., Chief Deputy County Counsel, Greer D. Knopf, Deputy County Counsel, Larry J. Frierson and Paterson & Taggart for Defendants and Appellants.

Russell M. Koch, County Counsel (Merced), Doris Lacy, Deputy County Counsel, Robert J. Henry, John H. Larson, County Counsel (Los Angeles), Leroy W. Blankenship, Deputy County Counsel, Biddle, Walters & Bukey, John L. Bukey, Keith C. Sorenson, District Attorney (San Mateo), Thomas Casey III, Assistant District Attorney, Iver E. Skjeie, County Counsel (Monterey), Paul R. Delay, Deputy County Counsel, Garfield, Schwartz & Copeland, Tim Garfield, James P. Botz, County Counsel (Sonoma), V. T. Hitchcock, Deputy County Counsel, Thomas T. Anderle, Peter Landsberger, Stephen W. Hackett, County Counsel (Napa), Clifford Lober, Deputy County Counsel, Parker & Covert, Clayton Parker, Spencer Covert, Jr., Gerald Sherwin, County Counsel (San Joaquin), Mark Ornellas, Deputy County Counsel, Dorothy L. Schechter, County Counsel (Ventura), and Mary C. Ward, Deputy County Counsel, as Amici Curiae on behalf of Defendants and Appellants.

OPINION

**THE COURT.**—California Teachers Association (CTA) sought a peremptory writ of mandate from the superior court directing the San Diego Community College District and its chancellor (district) to reclassify and reemploy certain part-time teachers (part-timers) as contract or regular employees for the 1976-1977 school year and to award the part-timers back pay, with interest, equal to the difference between their salaries as temporary employees and the salaries to which they would have been entitled as permanent employees.

The superior court granted the writ on the issue of reclassification but denied it as to back pay. The district appealed from the former ruling, and CTA appealed from the latter. Most of the issues presented in these appeals were resolved by our decision in *Peralta Federation of Teachers* v. *Peralta Community College Dist.* (1979) 24 Cal.3d 369 [155 Cal.Rptr. 679, 595 P.2d 113]. The principal question remaining, which we now must decide, is the appropriate method of computing the back pay to which those part-timers who will be reclassified are entitled.

CTA brought this action on behalf of its members who were part-time instructors in the district during the 1976 spring semester and who were classified as temporary employees because they worked less than

60 percent of the hours per week considered a full-time assignment for permanent employees having comparable duties.

The district employs three classes of instructors: regular (permanent or tenured), contract (probationary) and temporary. Some regular and contract teachers are employed part-time and are paid a salary prorated to the salary of a full-time teacher. Temporary teachers are paid a flat hourly rate which is less than the amount paid a salaried employee. Temporary employees do not receive certain fringe benefits associated with contract or regular employment, and they may be dismissed without notice or hearing. They are not, however, expected to hold office hours, serve on professional committees or supervise student activities, all of which are required of full-time teachers.

In *Peralta Federation of Teachers* v. *Peralta Community College Dist., supra*, 24 Cal.3d 369, we clarified the meaning of Education Code section 13337.5 (now recodified as § 87482).[1] We held that the final paragraph of that section must be read independently from the preceding three paragraphs and that therefore part-timers coming under that provision shall be classified as temporary employees only. Section 13337.5 does not, however, apply to persons who were hired before its effective date, November 8, 1967. (*Ibid.*; see also *Balen* v. *Peralta Junior College Dist.* (1974) 11 Cal.3d 821 [114 Cal.Rptr. 589, 523 P.2d 629].) We therefore concluded that part-time employees who had been employed before November 8, 1967, became regular employees pursuant to section 13346.25 and were entitled to receive pro rata back pay insofar as such claims were not barred by the applicable three-year statute of limitations (Code Civ. Proc., § 338, subd. 1).

---

[1]Unless otherwise indicated, all section references are to the Education Code of 1959, as it read just before its recodification effective April 30, 1977.

Section 13337.5 provided: "Notwithstanding the provisions of Section 13337, the governing board of a school district maintaining a community college may employ as a teacher in grade 13 or 14, for a complete school year but not less than a complete semester or quarter during a school year, any person holding appropriate certification documents, and may classify such person as a temporary employee. The employment of such persons shall be based upon the need for additional certificated employees for grades 13 and 14 during a particular semester or quarter because of the higher enrollment of students in those grades during that semester or quarter as compared to the other semester or quarter in the academic year, or because a certificated employee has been granted leave for a semester, quarter, or year, or is experiencing long-term illness, and shall be limited, in number of persons so employed, to that need, as determined by the governing board.

"Such employment may be pursuant to contract fixing a salary for the entire semester or quarter.

"No person shall be so employed by any one district for more than two semesters or

Our holding in *Peralta* that the plaintiffs who had been employed before November 8, 1967, were entitled to additional back pay was based on our conclusion that Education Code section 13503.1 applied to community college districts.[2] Present arguments of the district and amici urging reexamination of that conclusion are essentially the same as those ably articulated in the dissent in *Peralta,* and we are not persuaded to overrule that case.

■ Since the rights of part-timers who were initially employed before November 8, 1967, are clearly encompassed in CTA's description in its petition of those on whose behalf the action was brought,[3] we turn now to the principal issue in this case. What is the proper method of determining pro rata pay under section 13503.1?

Section 13503.1 provides that "In fixing the compensation of part-time employees, governing boards shall provide an amount which bears the same ratio to the amount provided full-time employees as the time actually served by such part-time employees bears to the time actually served by full-time employees of the same grade or assignment."

The key question is the meaning of the phrase "time actually served." CTA asserts that it refers to classroom hours only. The district, on the other hand, asserts that the phrase "time actually served" refers to time spent working on the job, including time spent both inside and outside of the classroom.

---

quarters within any period of three consecutive years.

"Notwithstanding any other provision to the contrary, any person who is employed to teach adult or community college classes for not more than 60 percent of the hours per week considered a full-time assignment for permanent employees having comparable duties shall be classified as a temporary employee, and shall not become a probationary employee under the provisions of Section 13446."

[2]Section 13503.1 provided: "Any person employed by a district in a position requiring certification qualifications who serves less than the minimum schoolday as defined in Sections 11003 to 11008, inclusive, or 11052 may specifically contract to serve as a part-time employee. In fixing the compensation of part-time employees, governing boards shall provide an amount which bears the same ratio to the amount provided full-time employees as the time actually served by such part-time employees bears to the time actually served by full-time employees of the same grade or assignment. This section shall not apply to any person classified as a temporary employee under Section 13337 and 13337.5, or any person employed as a part-time employee above and beyond his employment as a full-time employee in the same school district."

[3]The petition stated that it was brought on behalf of "CTA members who were part-time teachers in the DISTRICT during the Spring 1976 semester, who purportedly were classified by the DISTRICT as temporary employees, and who were employed to teach community college classes for not more than 60% of the hours per week considered a full-time assignment for permanent employees having comparable duties."

In construing a statute "we begin with the fundamental rule that a court 'should ascertain the intent of the Legislature so as to effectuate the purpose of the law.'" (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) "An equally basic rule of statutory construction is, however, that courts are bound to give effect to statutes according to the usual, ordinary import of the language employed in framing them." (*Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 604 [45 Cal.Rptr. 512]; *Moyer* v. *Workmen's Comp. Appeals Bd., supra,* 10 Cal.3d, at p. 230.) Although a court may properly rely on extrinsic aids, it should first turn to the words of the statute to determine the intent of the Legislature. (*People* v. *Knowles* (1950) 35 Cal.2d 175, 182 [217 P.2d 1]; *Tracy* v. *Municipal Court* (1978) 22 Cal.3d 760, 764 [150 Cal.Rptr. 785, 587 P.2d 227].) "If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history." (*People* v. *Knowles, supra,* 35 Cal.2d, at p. 183; *Rich* v. *State Board of Optometry, supra,* 235 Cal.App.2d, at p. 604.)

The language of section 13503.1 supports the district's position. Community college instructors commonly have a number of duties besides classroom teaching. Such duties include counseling, holding office hours, supervising student activities and serving on professional committees. The phrase "time actually served" clearly encompasses those activities as well as classroom teaching. Moreover, the scanty legislative history of the statute appears to support its plain meaning.

Section 13503.1 was amended in 1968 to read as stated. The amendment originated from Senate Bill No. 138, introduced by Senator Rodda. The portion of the statute at issue here formerly provided that the measure of the ratio was as the amount of "time actually served by such part-time employees bears to the time *required of full-time employees assigned to the same grade.*" (Italics added.) The emphasized language was deleted in favor of the language now at issue, thereby making the measure the time "actually served by full-time employees" rather than the time "required of full-time employees." The Legislative Counsel's Digest provides little guidance as to the purpose of the change. It states only that the amendment "Alters the method for establishing the rate of compensation for such part-time employee as a ratio to amount paid full-time employees."

CTA relies on a statement by the author of the bill, Senator Rodda, in support of its proffered interpretation of "time actually served" as referring only to classroom hours taught. This statement was submitted by Senator Rodda to Governor Reagan in support of the bill's approval. The statement said: "Certificated employees may contract with a school district to serve on a part-time basis. Such part-time certificated employees are paid a pro-rated amount in proportion to the amount of time they serve as to the amount of time required of full-time employees of like positions on the salary schedule.

"This legislation would provide that part-time employees shall be paid on the basis that the proportion of the time actually served bares [*sic*] to the minimum schoolday as provided in law, thereby proportional to the amount of state income received.

"Inasmuch as every school district may determine the amount of time required of full-time employees, there is a lack of consistency as to the basis upon which part-time employees may be paid. Under current law, it is possible for a school district to receive the equivalent state income generated by a full-time teacher while paying that teacher on a part-time basis.

"The effect of this bill would be to make the proportional ratio of salary payments to part-time employees based upon and consistent with the amount of state income they generate by their teaching activities; it would make such application consistent throughout the state."

The district objects to use of Senator Rodda's statement in determining the Legislature's intent. CTA, however, asserts that we must not consider this point because no objection to the use of the material was made in the trial court. ■ The interpretation of a statute, however, is a question of law, and we are not bound by evidence presented on the question in the trial court. (See *Rich* v. *State Board of Optometry, supra*, 235 Cal.App.2d, at p. 604; *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 258 [104 Cal.Rptr. 761, 502 P.2d 1049].) The propriety of the use of extrinsic materials in determining legislative intent is a question which may properly be considered on appeal regardless of whether the issue was raised in the trial court.

■ The district contends that the use of Senator Rodda's statement would violate well-settled principles of statutory construction. We agree. "In construing a statute we do not consider the motives or under-

standings of individual legislators who cast their votes in favor of it. [Citations.] Nor do we carve an exception to this principle simply because the legislator whose motives are proffered actually authored the bill in controversy [citation]; no guarantee can issue that those who supported his proposal shared his view of its compass." (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589-590 [128 Cal.Rptr. 427, 546 P.2d 1371].) A legislator's statement is entitled to consideration, however, when it is a reiteration of legislative discussion and events leading to adoption of proposed amendments rather than merely an expression of personal opinion. (*Id.*, at p. 590; *Friends of Mammoth* v. *Board of Supervisors, supra*, 8 Cal.3d, at p. 284 (dis. opn. by Sullivan, J.); *Rich* v. *State Board of Optometry, supra*, 235 Cal.App.2d, at p. 603; see also *Stanton* v. *Panish* (1980) 28 Cal.3d 107, 114 [167 Cal.Rptr. 584, 615 P.2d 1372] [declaration of chairman of Cal. Const. Revision Com. considered insofar as it chronicled events leading to proposed amendment].) The statement of an individual legislator has also been accepted when it gave some indication of arguments made to the Legislature and was printed upon motion of the Legislature as a "letter of legislative intent." (*In re Marriage of Bouquet, supra*, 16 Cal.3d, at pp. 590-591.)

The foregoing language in *Bouquet*, in our view, refers to the admissibility of the evidence rather than its weight, as suggested by the concurring opinion.[4] In *Bouquet* the legislator's letter was determined to be a proper subject of consideration because it alluded to arguments the legislator had presented in arguing for passage of the bill and because it had been printed on motion of the Legislature as a "letter of legislative intent." (*In re Marriage of Bouquet, supra*, 16 Cal.3d at pp. 590-591.) This conclusion was followed by a discussion of the weight to be accorded the letter. (*Ibid.*) The latter discussion would have been unnecessary if the previous discussion regarding the propriety of considering such evidence had been referring to the weight to be accorded it rather than its admissibility.

---

[4]Our use of the term admissibility here does not refer to the question of whether to allow the introduction of a piece of evidence in the trial court to prove a fact. Since the interpretation of a statute is a question of law on which we are not bound by the evidence presented in the trial court, we use the term admissibility here to refer to the issue of whether the evidence may properly be considered on the question. We recognize, however, that a court must make an initial review of the evidence in order to determine whether it is entitled to be considered on the question of determining the Legislature's intent. (Cf. *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37-40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Estate of Russell* (1968) 69 Cal.2d 200, 207 [70 Cal.Rptr. 561, 444 P.2d 353].) Thus,

There has been confusion in recent years regarding the propriety of considering statements and letters by individual legislators on the question of legislative intent. Indeed, the concurring opinion is correct in noting that recent opinions of this court have referred to such evidence without mention of the limitations on its use. In none of these opinions, however, was the subject of the propriety of the practice discussed or addressed. Such a departure from past rules of statutory construction, we believe, should be effected only after full discussion and exposure of the issue.

There are sound reasons underlying the rule against admitting statements of personal belief or intent by individual legislators on the issue of legislative intent. In addition to the lack of assurance that anyone shared the legislator's view, as noted in *Bouquet,* there is the concern that letters such as those sent to the Governor on the question of signing the bill may never have been exposed to public view so that those with differing opinions as to the bill's meaning and scope had an opportunity to present their views also. To consider or to allow the admission of such evidence in the face of its admitted irrelevance (see conc. opn., p. 706) seems senseless. Accordingly, we believe that the wiser course is to adhere to the rules set forth in *In re Marriage of Bouquet* regarding the admissibility of evidence of statements by individual legislators on legislative intent.

The statement in the present case does not allude to "argument that he had presented in securing the passage of the amendment." (*Id.,* 16 Cal.3d at p. 590.) Nor does it reiterate the discussion and events which transpired in the Legislature. The statement reveals only the author's personal opinion and understanding and accordingly, is not a proper subject for consideration in determining the Legislature's intent in amending section 13503.1. *Campbell* v. *Board of Dental Examiners* (1975) 53 Cal.App.3d 283 [125 Cal.Rptr. 694], is disapproved to the extent it is inconsistent with this opinion.

Even if we were to consider Senator Rodda's statement, it provides little guidance. Its reference to the asserted relationship of part-time teaching to school income provides no basis for concluding that "time actually served" means only classroom hours.

---

the evidence must be preliminarily considered in order to determine whether it may ultimately be properly used in determining the Legislature's intent or whether it instead should be rejected as being unworthy of consideration on that issue based upon the legal concepts above expressed.

■ We conclude that the proper measure for apportioning part-time pay under section 13503.1 is the time actually spent on the job both inside and outside of the classroom. This does not mean that the required number of hours for full-time instructors set by the districts may be used as the measure, for that is the very measure that was deleted from the statute when it was amended to include the "time actually served" language now at issue. The reference to "time actually served," in our view, requires consideration of the total amount of time spent by part and full-time teachers in connection with their teaching.

As previously mentioned, the issue of reclassification was resolved by our decision in *Peralta Federation of Teachers* v. *Peralta Community College Dist., supra,* 24 Cal.3d 369. Accordingly, we reverse the judgment for further proceedings to permit the trial court to determine which part-timers, if any, are entitled to reclassification and to determine the amount of pro rata back pay to be awarded.

The judgment is reversed for proceedings consistent with this opinion. Each side shall bear its own costs on these appeals.

**NEWMAN, J.,** Concurring.—The majority conclude that the statement submitted by Senator Rodda to the Governor is "not a proper subject for consideration in determining the Legislature's intent..." (*ante,* p. 701).

To decide that collateral issue we do not, of course, rely on the Evidence Code or the common law of evidence. Instead we look to precedents that concern statutes and the use of extrinsic aids when courts construe statutes. Also, we consider federal as well as state precedents because California courts often interpret federal as well as state laws.[1]

Regarding legislators' comments, the judicial opinions of earlier decades sometimes referred to admissibility rules. Illustrative is this dictum from *Bagg* v. *Wickizer* (1935) 9 Cal.App.2d 753, 757 [50 P.2d 1047]: "Where no ambiguity exists, the intention of the lawmakers must be determined by the language of the statute. In *Ex parte Goodrich* [1911], 160 Cal. 410 [117 Pac. 451, Ann. Cas. 1913 A, 56], it is said: '...[I]t still remains true that even legislative debates are not appropriate

---

[1]In this opinion I do not discuss differences between (1) statutes, and (2) other written laws such as constitutions, charters, ordinances, administrative regulations, treaties, etc.

sources of information from which to discover the meaning of the language of the statute. (*United States* v. *Trans-Missouri Freight Assn.*, 166 U.S. 290 [17 Sup. Ct. 540, 41 L.Ed. 1007]; *American Net & Twine Co.* v. *Worthington*, 141 U.S. 468 [12 Sup. Ct. 55, 35 L.Ed. 821].) And it still remains true that even the testimony or opinions of individual members of the legislative body are not admissible for the purpose of showing what in fact was intended or meant by an act. (*State* v. *Burk*, 88 Iowa, 661 [56 N. W. 180]; *Richmond* v. *Supervisors*, 83 Va. 204 [2 S. E. 26]; *People* v. *Smith*, 78 Hun, 179 [28 N. Y. Supp. 912].)' In *People* v. *Stanley* [1924], 193 Cal. 428 [225 Pac. 1], the Supreme Court said: 'It is a cardinal rule applicable to the interpretation of statutes that in order to ascertain the intent of the legislature in enacting the same, recourse must first be had to the language of the. statute itself; and that if the words of the enactment given their ordinary and proper signification are reasonably free from ambiguity and uncertainty, the courts will look no further to ascertain its meaning. . . .' 'This must be done even though it appear probable that a different object was in the mind of the legislature.' (*Mulville* v. *City of San Diego*, 183 Cal. 734 [192 Pac. 702].)"

No longer do those ideas frame our approach to interpretive issues. No longer do judges risk distorting their analyses of statutes by insulating themselves from extrinsic aids. No longer does the discredited plain meaning rule, or any comparable admissibility rule, command that courts shield themselves from what legislators may have said relevantly.

"It would be anomalous to close our minds to persuasive evidence of intention on the ground that reasonable men could not differ as to the meaning of the words. Legislative materials may be without probative value, or contradictory, or ambiguous, it is true, and *in such cases* [*they*] *will not be permitted to control the customary meaning of words or overcome rules of syntax or construction found by. experience to be workable*; they can scarcely be deemed to be incompetent or irrelevant. . . . The meaning to be ascribed to an Act. . .can only be derived from the considered weighing of every relevant aid to construction." (*United States* v. *Dickerson* (1940) 310 U.S. 554, 562 [84 L.Ed. 1356, 1362, 60 S.Ct. 1034]; italics added. See also comments of Frankfurter, J. in *United States* v. *Monia* (1943) 317 U.S. 424, 431 [87 L.Ed. 376, 381-382, 63 S.Ct. 409], Traynor, J. in *People* v. *Knowles* (1950) 35. Cal.2d 175, 182 [217 P.2d 1], Linde, J. in *Chapman Bros., etc.* v. *Miles-Hiatt Inv., Inc.* (1978) 282 Ore. 643 [580 P.2d 540, 542, fn. 2].)

## ADMISSIBILITY VS. WEIGHT

The problems that continue to perplex us should not be treated as problems of admissibility. They are problems of weight, problems of persuasiveness. Courts usually are not persuaded, for example, by the testimony or affidavit or other statement of a legislator when it appears to have been articulated for use in a pending lawsuit.

Why *post-dispute statements* often lack weight and are not persuasive was discussed in *Carmona* v. *Division of Industrial Safety* (1975) 13 Cal.3d 303, 311, fn. 8 [118 Cal.Rptr. 473, 530 P.2d 161], as follows: "[I]t seems clear that the proferred declaration...can be given little credence. There is absolutely no showing that the present 'interpretive' declaration was before the rulemaking body of the agency when section 3316 was promulgated. [¶] Moreover, the facts of the instant case illustrate the great potential for abuse that would arise if the profferred declaration were given significant weight. The declaration at issue was prepared by an employee of one of the parties to .this litigation subsequent to the filing of judicial proceedings. The self-interest inherent in such a process removes from the declaration the appearance of impartiality necessary to justify any reliance by the court."

See too *Bauman* v. *Islay Investments* (1973) 30 Cal.App.3d 752, 756 [106 Cal.Rptr. 889]: "Despite the declaration of State Assemblyman Brown,[4] we must determine for ourselves, on the basis of ordinary standards of construction, whether the 'nonrefundable' provision hereinafter discussed is valid in this case. While official committee reports can be utilized to aid in statutory interpretation, the views of individual legislators are of little help in determining the intent of the Legislature as a whole [citing *Friends of Mammoth, infra*]."

(The *Bauman* court's fn. 4, 30 Cal.App.3d at p. 756, reads: "Respondents have attached to their brief filed in this court a declaration by Assemblyman Willie Brown, Jr., one of the coauthors of the bill which resulted in the enactment of section 1951. We set forth that declaration in Appendix 'C' to this opinion." Cf. *Boie-Hansen* v. *Sisters of Charity* (1957) 152 Cal.App.2d 845, 848 [314 P.2d 189] (city councilman) and *Larcher* v. *Wanless* (1976) 18 Cal.3d 646, 654, fn. 10 [135 Cal.Rptr. 75, 557 P.2d 507] ("legislative affidavits do not address [the] crucial issue, except in...an implication refuted by the statute itself"). Note, though, the conclusion implied in *Rosenthal* v. *Cory* (1977) 69 Cal.

App.3d 950, 955 [138 Cal.Rptr. 442]: "[W]e find persuasive support for the trial court's decision and our decision in the testimony of Senator Deukmejian, the author of the bill which became Government Code 75033.5. That testimony was to the effect that he intended the 'tack on' provisions to be included in that statute. While not conclusively controlling, an author's statement of intent is highly probative on the question. (*Campbell* v. *Board of Dental Examiners*, 53 Cal.App.3d 283 [125 Cal.Rptr. 694]; *Friends of Mammoth* v. *Board of Supervisors*, 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049].)" Generally see Delahanty, *Super Legislators: One Person Amendment of Statutes in California*, L.A. Daily J. Rep. (Sept. 22, 1978) No. 78-18, p. 4.)

## WELL-SETTLED PRINCIPLES?

Citing *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589-590 [128 Cal.Rptr. 427, 546 P.2d 1371], the majority here endorse the contention that "use of Senator Rodda's statement would violate well-settled principles of statutory construction." (*Ante*, p. 699.) Also cited, for the proposition that "[a] legislator's statement is entitled to consideration, however, when it is a reiteration of legislative discussion and events leading to adoption of proposed amendments rather than merely an expression of personal opinion," are *Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 603 [45 Cal.Rptr. 512], and the dissenting opinion in *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 284 [104 Cal.Rptr. 761, 502 P.2d 1049]. (Cf. Smith, *Legislative intent: In search of the Holy Grail* (1978) 53 State Bar J. 294, 298.) Further, "[t]he statement of an individual legislator has also been accepted when it gave some indication of arguments made to the Legislature and was printed upon motion of the Legislature as a 'letter of legislative intent.' (*In re Marriage of Bouquet, supra*, 16 Cal.3d, at pp. 590-591.)" (*Ante*, p. 700.)

My colleagues therefore disapprove *Campbell* v. *Board of Dental Examiners* (1975) 53 Cal.App.3d 283 [125 Cal.Rptr. 694] and, implicitly, the majority opinion in *Friends of Mammoth, supra*, 8 Cal.3d at pages 257-258. Surprisingly, innumerable other precedents have been ignored. One is *Peralta Federation of Teachers* v. *Peralta Community College Dist.* (1979) 24 Cal.3d 369 [155 Cal.Rptr. 679, 595 P.2d 113]. Here the court's opinion states (*ante*, p. 697): "Present arguments...urging reexamination of [*Peralta*] are essentially the same as those ably articulated in the dissent..., and we are not persuaded to overrule that case." Yet, in effect, the conclusion in *Peralta* that "a letter dated June 26,

1967, from Senator Grunsky to the Governor" was duly considered is now overruled. (24 Cal.3d at p. 380.)

Also, the majority cast doubt on the propriety of justices' having used legislators' comments in these recent opinions: *Lugosi* v. *Universal Pictures* (1979) 25 Cal.3d 813, 842, footnote 23 [160 Cal.Rptr. 323, 603 P.2d 425] (Bird, C. J.; Vasconcellos letter to Governor); *In re Eric J.* (1979) 25 Cal.3d 522, 534 [159 Cal.Rptr. 317, 601 P.2d 549] (Clark, J.; letter from Sen. Sieroty); *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 847 [157 Cal.Rptr. 676, 598 P.2d 836] (Richardson, J.; Governor's reliance on PUC legal staff opinion); *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880, 887, footnote 5 [153 Cal.Rptr. 842, 592 P.2d 329] (Mosk, J.; no intimation that letters to Governor are inadmissible); *People* v. *Tanner* (1979) 24 Cal.3d 514, 520, footnote 4 [156 Cal.Rptr. 450] (Clark, J.; ACLU letter to Governor; cf. p. 543, fn. 3: Newman, J. responds; p. 545: Newman, J. cites A.G. letter to Governor); *In re Marriage of Morrison* (1978) 20 Cal.3d 437, 447, footnote 6 [143 Cal.Rptr. 139, 573 P.2d 41] (Bird, C. J.; Willson letter to Governor); *People* v. *Peters* (1978) 21 Cal.3d 749, 762 [147 Cal.Rptr. 646, 581 P.2d 651] (dis. opn. of Bird, C. J.; Sen. Song letter to Governor).

Against that array of recent opinions[2] and against *Friends of Mammoth* and *Peralta, supra,* the majority rely on *Rich* v. *State Board of Optometry, supra,* 235 Cal.App.2d 591 at page 603 [45 Cal.Rptr. 512] and *In re Marriage of Bouquet, supra,* 16 Cal.3d at pages 589-590. In *Bouquet* this court did not, I submit, rule that Assemblyman Hayes's "personal views" were inadmissible. They were characterized instead as "irrelevant" (*id.,* p. 589; and see also p. 590: "The understandings of Assemblyman Hayes...do not per se expose the Legislature's intent.").

What about the cases that were cited in *Bouquet*? *In re Lavine* (1935) 2 Cal.2d 324 [41 P.2d 161, 42 P.2d 311] was decided the same

---

[2]See too, e.g., *Stewart* v. *Board of Medical Quality Assurance* (1978) 80 Cal.App.3d 172, 182-183 [143 Cal.Rptr. 641]; *Pacific Legal Foundation* v. *Unemployment Ins. Appeals Bd.* (1977) 74 Cal.App.3d 150, 155 [141 Cal.Rptr. 474]; hearing denied December 15, 1977.

The majority opinion reads, "see also *Stanton* v. *Panish* (1980) 28 Cal.3d 107, 114..." (*ante,* p. 700). By no means, I submit, does *Stanton* stand for the proposition that Chairman Bruce Sumner's declaration was "considered [only] insofar as it chronicled events leading to [the] proposed amendment..." (*ibid.*). The per curiam opinion cites both *Friends of Mammoth, supra,* 8 Cal.3d at pages 257-258 and *Tillie Lewis Foods, infra,* 52 Cal.App.3d at pages 1006-1007. (Cf. *post,* dis. opn. at p. 710.)

year as *Bagg* v. *Wickizer*, 9 Cal.App.2d 753 [50 P.2d 1047], the case I discussed in my third to fifth paragraphs above. Obviously it has become antiquated. Further, this excerpt shows that even 45 years ago the court was concerned more with weight than with admissibility (2 Cal.2d p. 327): "[W]e are satisfied that the language of said statute is sufficiently comprehensive to achieve the result for which petitioner contends and we therefore find it unnecessary to attach any weight to a letter, copy of which accompanies the petition, addressed to petitioner by the author of the bill introduced in the legislature, and which later became the statute here involved, wherein it is stated that the 'object in introducing this bill [was] to bring about the full restoration to all rights and privileges, and particularly to the restoration of the practice of law of those who had been convicted of a crime and upon a review of the cause by the Governor, had been granted a full pardon'. In construing a statute we are to be governed solely by the language employed, and are not bound by the opinions of individual members of the legislative body."

*California Emp. etc. Com.* v. *Payne* (1947) 31 Cal.2d 210, 213 [187 P.2d 702], cited in *Bouquet*, 16 Cal.3d at page 589, does not discuss individual legislators' statements. *Sato* v. *Hall* (1923) 191 Cal. 510 [217 P. 520] concerns "a speech in Congress" and "discussions preceding the enactment of the [federal] act," which indisputably are admissible.

The *Bouquet* opinion mentions neither *Friends of Mammoth, supra,* 8 Cal.3d 247, 257, which implies that legislators' statements are admissible whether or not they are "persuasive," nor *Ballard* v. *Anderson* (1971) 4 Cal.3d 873, 881 [95 Cal.Rptr. 1, 484 P.2d 1345, 42 A.L.R.3d 1392] (accord); and see *Silver* v. *Brown* (1966) 63 Cal.2d 841, 846 [48 Cal.Rptr. 609, 409 P.2d 689]; *Carmona* v. *Division of Industrial Safety, supra,* 13 Cal.3d 303, 311, footnote 8.

Also ignored were *Campbell* v. *Board of Dental Examiners* (1975) 53 Cal.App.3d 283, 285 [125 Cal.Rptr. 694] (which, as noted above, the majority here now disapprove) and *Tillie Lewis Foods Inc.* v. *City of Pittsburg* (1975) 52 Cal.App.3d 983, 1006 [124 Cal.Rptr. 698].

*Epstein* v. *Resor* (N.D.Cal. 1969) 296 F.Supp. 214, 216, cited on *Bouquet*'s page 589, 16 Cal.3d, does not correctly summarize the federal precedents. Note too that "the affidavit [was] prepared and submitted by the Honorable John E. Moss solely for purposes of this lawsuit...."

In *Bragg* v. *City of Auburn* (1967) 253 Cal.App.2d 50, 54 [61 Cal.Rptr. 284], cited on *Bouquet*'s page 589, 16 Cal.3d, the court seemed to focus on judicial notice questions: "Petitioner 'filed' in the court below a paper entitled 'Declaration of James R. Mills.' Mr. Mills declares that he was an Assemblyman, one of the authors of Assembly Bill 2981 at the 1961 legislative session. In a general way the paper declares Mr. Mills' belief or opinion that the amended bill, equally with the original bill, would override the *Mervynne* decision. This declaration was filed in the trial court after the hearing on the mandamus application and after the trial judge had issued his memorandum opinion adverse to petitioner. It is ostensibly included in the clerk's transcript on appeal. Petitioner points to Mr. Mills' declaration as evidence of the legislative intent underlying the 1961 amendment of section 22508.

"The declaration is substantively and procedurally inacceptable. The statement of an individual legislator as to his intention, motive or opinion regarding a particular piece of legislation is inadmissible. (*In re Lavine*, 2 Cal.2d 324, 327 [41 F.2d 161, 42 P.2d 311]; *Rich* v. *State Board of Optometry*, 235 Cal.App.2d 591, 603 [45 Cal.Rptr. 512].) Mr. Mills' declaration was neither offered nor received as evidence in the trial court. Its contents were ineligible for judicial notice. (See Evid. Code, §§ 450, 451, 452.) Inadmissible evidence may not be force-fed into litigation by metamorphosing it into a document 'filed' ex parte with the clerk's office outside the arena of adversary trial; nor may it be bootstrapped into cognizability by designating it as part of the clerk's transcript on appeal."

Ignored in the *Bragg* case, apparently, was this second paragraph of the Law Revision Commission's comment on Evidence Code section 450: "Under the Evidence Code, as under existing law, courts may consider whatever materials are appropriate in construing statutes.... That a court may consider legislative history, discussions by learned writers in treatises and law reviews, materials that contain controversial economic and social facts or findings or that indicate contemporary opinion, and similar materials is inherent in the requirement that it take judicial notice of the law. In many cases, the meaning and validity of statutes...can be determined only with the help of such extrinsic aids. Cf. People v. Sterling Refining Co., 86 Cal.App. 558, 564, 261 Pac. 1080, 1083 (1927) (statutory authority to notice 'public and private acts' of legislature held to authorize examination of legislative history of certain acts)...." (See *McGlothlen* v. *Department of Motor Vehicles* (1977) 71 Cal.App.3d 1005, 1015 [140 Cal.Rptr. 168].)

That leaves *Rich, supra*, 235 Cal.App.2d 591, 603, cited in *Bouquet*, 16 Cal.3d at page 590 and also by the majority here (*ante*, p. 700). Only via dictum does it support a rule of inadmissibility; and for that dictum it relies solely on *Lavine, Boie-Hansen*, and *Goodrich*, all discussed and distinguished above.

So, is it true that "well-settled principles" support the rule the majority now propound? I think not. This court and Courts of Appeal, for at least 10 years and with considerable consistency,[3] have not held extrinsic aids inadmissible and, rather, have observed a "Learned Hand rule" described as follows: "...Judge Hand's opinions, while they make full use of legislative guides, nevertheless subordinate them, like the words of an act, to the principal task of deriving the specific intent of Congress from a full and sympathetic understanding of its purpose. [Fn. omitted.] [¶] Thus subordinated, the legislative history may reliably explain a choice of words which on their face seem meaningless or inconsistent with the general purpose. It may reveal, for example, a deliberate truncation of the purpose, in which event the words must govern; or it may show that the choice of words resulted from some decision quite unrelated to the point at hand and so permit taking otherwise objectionable liberties with the normal meaning of the words." (Cox, *Judge Learned Hand and the Interpretation of Statutes* (1947) 60 Harv.L.Rev. 370, 381-382. See also 2A Sands, Sutherland's Statutes and Statutory Construction (4th ed. 1973) p. 217: "Insofar as legislative intention is taken as the standard of decision on a question of statutory construction, [fn. omitted] it can reasonably be argued that any legislator's remarks which would throw light on the meaning of those words should be admitted, regardless of whether they are statements as to their meaning or statements as to the problems before the legislature. Although generally entitled to little probative weight, the value of such remarks could be left to depend upon how well informed their author appeared to be and how well he seemed to represent the views of his colleagues." Cf. Wasby, *Legislative Materials as an Aid to Statutory Interpretation: A Caveat* (1963) 12 J. Pub. L. 262; Newman, *A Legal Look at Congress and the State Legislatures*, in Legal Institutions Today and Tomorrow (Paulsen edit. 1959) pp. 75-76 ("The art of deliberate ambiguity" and "The manufacture of legislative intent").)

---

[3]*Grant* v. *Adams* (1977) 69 Cal.App.3d 127, 135 [137 Cal.Rptr. 834], and *Lewis* v. *Ryan* (1976) 64 Cal.App.3d 330, 335, footnote 1 [134 Cal.Rptr. 355], are inconsistent. For authority, each relies solely on *Marriage of Bouquet, supra*, 16 Cal.3d at page 589. (See too *Hutchins* v. *Municipal Court* (1976) 61 Cal.App.3d 77, 89, fn. 14 [132

The plain meaning rule fortunately has been discredited. We should not now concoct a new rule on admitting evidence that relentlessly will lead us to the kinds of vagaries and absurdities that the discredited rule helped effect.

I concur in the reversal of the judgment here, and I agree with the majority's conclusion that Senator Rodda's statement "provides little guidance" (*ante*, p. 701).

**BIRD, C. J.**—I respectfully dissent.

Only three short months ago this court bottomed its interpretation of a section of the California Constitution on the written declaration of 1 member of an 80-member commission some 14 years after the event! (See *Stanton* v. *Panish* (1980) 28 Cal.3d 107 [167 Cal.Rptr. 584, 615 P.2d 1372].) Today, this court holds that a declaration by the author of legislation sent to the Governor, which outlines the intent of the legislation and urges the Governor to sign it, is "not a proper subject for consideration in determining the Legislature's intent...." (Maj. opn., at p. 710.) Ah, "consistency thou art a jewel."

I agree with my colleague, Justice Newman, that the rule promulgated today will only "lead us to the kinds of vagaries and absurdities that the discredited rule helped effect." (Conc. opn., above.)

The issue before the court is the proper method of computing the retroactive compensation due instructors ordered reclassified and reemployed as permanent employees. Section 13503.1 (now recodified as § 45025) provides that "[i]n fixing the compensation of part-time employees, governing boards shall provide an amount which bears the same ratio to the amount provided full-time employees as the *time actually served* by such part-time employees bears to the *time actually served* by full-time employees of the same grade or assignment." (Italics added.)

As the unanimous opinion of Justice Howard Wiener of the Court of Appeal recognized, "[t]he statute, in furnishing the answer to the method of compensating part-time employees also creates the problem for the phrase 'time actually served' is wonderfully ambiguous." As a re-

Cal.Rptr. 158], which puzzlingly cites only *Lavine, supra*, 2 Cal.2d at p. 327 and *Friends of Mammoth, supra*, 8 Cal.3d at p. 258.)

sult, the statement by the bill's author in a letter to the Governor, becomes important in determining legislative intent. The Senator wrote that "'[t]his legislation would provide that part-time employees shall be paid on the basis that the proportion of the time actually served bares [*sic*] to the minimum schoolday as provided in law, thereby proportional to the amount of state income received. [¶] Inasmuch as every school district may determine the amount of time required of full-time employees, there is a lack of consistency as to the basis upon which part-time employees may be paid. Under current law, it is possible for a school district to receive the equivalent state income generated by a full-time teacher while paying that teacher on a part-time basis. The effect of this bill would be to make the proportional ratio of salary payments to part-time employees based upon and *consistent with the amount of state income they generate by their teaching activities*; it would make such application consistent throughout the state.'" (Italics added.)

The Court of Appeal opinion goes on to point out that "[t]he income of the community college system is based on a set sum of dollars per pupil in average daily attendance (§ 17301.12, currently § 14020). Average daily attendance units are computed by multiplying the weekly student contact hours of enrollment by statewide factors established by the Board of Governors of the California Community Colleges. (§ 11475, currently § 84520.) The term 'contact hours' means in-class time. Thus, a part-timer teaching thirty students three class hours a week earns the same amount of state money for the college as would a full-time instructor teaching the same class. [¶] Since the object of section 13503.1 . . . was to pay part-timers a pro rata salary consistent with the amount of state income they generated by their teaching activities, the basis for their salaries should be the number of 'contact hours' they teach. On that basis, the phrase 'time actually served' means time spent in the classroom."

This court's holding is contrary to the Legislature's intent in amending the statute. The majority opinion includes in the "time actually served" concept, the hours spent in counseling, in supervising student activities, etc. These are included because they are duties full-time teachers *must* fulfill. However, the Legislature specifically amended the statute to eliminate "time required" and replace it with a formula more reflective of revenue-generating hours worked.

The majority's definition of "time actually served," which includes time for those "duties" that are done outside of the classroom setting, closely approximates the standard eliminated by the Legislature. For example, the district argues that full-time teachers must spend 30 hours on campus, while part-time teachers need not do so. The majority's approach would allow as many of those 30 hours as were actually spent on the campus, even though none of those hours would produce revenue for the district.

The district does not claim that the phrase, "time actually served," can be interpreted as anything other than classroom time for part-time teachers. The time these teachers spend counseling their students, explaining grades, reviewing papers or other incidental activities tied to their teaching functions has never been included by the district. Yet, when the court has the task of defining the very same term as applied to full-time teachers, it arrives at a totally different meaning for no apparent reason.

The majority opinion recognizes that "time actually served" must mean the same thing for part-time and full-time teachers. Thus, the majority requires the district to consider the "total amount of time spent by part and full-time teachers in connection with their teaching." (*Ante*, at p. 702.) It is unclear, however, what is included for part-timers.

The district asserts that part-time teachers do not have any duties outside the classroom. When a part-time teacher spends time reviewing an examination or paper with a student after class, is that time to be considered by the district or not? The majority opinion implies that it is. However, this ignores the fact that the district may have contracted only for the part-time teacher's class time. If the term "time actually served" is to fairly reflect (1) the hours spent in connection with teaching responsibilities for both part- and full-time teachers, and (2) the revenue-generating proportion intended by the Legislature, the only logical interpretation of the term is limited to classroom responsibilities.[1]

---

[1]The district and several amici suggest that the Court of Appeal's resolution of this issue would necessarily affect the full-time teacher's contract which includes nonclassroom hours. The sole issue before the court is how to calculate the *part-time* teacher's compensation under Education Code section 13503.1. The court's holding would not affect full-timers' assignments or compensation under either formula.

Additionally, the court's holding today will not affect the application of section 13503.1 to nonteaching certificated employees. The statute plainly requires comparison of time served by employees "of the same grade or assignment." (Ed. Code, § 13503.1.)

Therefore, the proper measure for determining back pay here, as the Court of Appeal correctly determined, is "the number of classroom hours [taught by part-timers] as compared to the number of classroom hours taught by full-time teachers." Since the majority opinion does not use this method, I must respectfully dissent since the Legislature's intent has not been followed.